ALCO PARKING CORPORATION,
a Pennsylvania Corporation,
Appellant, (at 906)

v.

PUBLIC PARKING AUTHORITY OF
PITTSBURGH, a Public Authority, and
Jeffrey T. Leber, an Individual, Appel-
lees.

LIBERTY PARKING, INC., a
Pennsylvania Corporation,
Appellant, at (908)

v.

PUBLIC PARKING AUTHORITY
OF PITTSBURGH, a Public
Authority, Appellee.

Superior Court of Pennsylvania.

Argued Oct. 28, 1997.

Filed Jan. 15, 1998.

Avrum Levicoff, Pittsburgh, for appellants.

Alan A. Garfinkel, Pittsburgh, for appellees.

Before POPOVICH, HUDOCK and HESTER, JJ.

HESTER, Judge:

Alco Parking Corporation ("Alco") and Liberty Parking, Inc. ("Liberty") filed appeals in this consolidated action following a trial court's determination that alleged oral agreements appellants entered with the former chairman of the board of appellee, the Public Parking Authority of Pittsburgh, could not be enforced. We affirm.

Appellants are experienced managers and operators of commercial parking garages. Appellee is a public authority organized under the Parking Authority Law. 53 P.S. §§ 341, *et seq.* Alco's predecessor, William Penn Parking Garage, Inc., and appellee entered into a written management agreement on November 3, 1981, wherein they agreed that William Penn would manage and operate appellee's Mellon Square Garage in Pittsburgh for a term of fifteen years, commencing on December 1, 1981, in exchange for a stipulated portion of the gross receipts from the garage. Approximately two years later, on March 1, 1984, the 1981 agreement was

extended through December 31, 2006. Thus, under that 1984 agreement, William Penn was given the management rights to the Mellon Square Garage for nearly twenty-two years.

Liberty and appellee entered into a written management agreement on December 30, 1977, wherein Liberty was awarded the right to manage and operate appellee's Ninth and Penn Garage in Pittsburgh for ten years, commencing on January 1, 1978, in exchange for a stipulated portion of the gross receipts from the garage. Liberty and appellee executed a nearly identical agreement with respect to the Wood–Allies Garage in Pittsburgh on March 11, 1982. On December 21, 1983, the 1978 agreement for the Ninth and Penn facility and the 1982 agreement for the Woods–Allies facility were both extended through December 31, 2006. Thus, Liberty was awarded the right to operate those two facilities for twenty-three years.

In 1985, appellee wanted to refinance its publicly-issued bonds in order to finance improvements to a number of its facilities, including the Mellon Square Garage, the Ninth and Penn Garage, and the Woods–Allies Garage (the "garages"). Under Internal Revenue Code regulations, appellee could not have management contracts exceeding a five-year duration for any of the facilities involved in the bond refinancing if it wanted to obtain tax-exempt status on the bonds. Thus, appellee's bond counsel, Eckert Seamans Cherin & Mellott, advised appellee it was not eligible to receive tax-exempt status for the bonds due to the 1983 and 1984 agreements if any bond funds were going to be used at the garages involved herein. Bond counsel also informed appellee the proposed refinancing would not be feasible unless appellee could meet the requirement for tax-exempt status due to the reduced marketability of a taxable bond issue and higher interest costs.

Appellee and appellants then re-negotiated all previous contracts in order that appellee would be eligible to issue tax-free bonds to provide funding to refurbish the garages managed by appellants. Specifically, on December 1, 1985, Alco and appellee executed a second, written amendment to their 1981 agreement. Under that second amendment,

the duration of the 1981 agreement as amended March 1, 1984, was shortened by providing for termination of that agreement on October 31, 1987.

Similarly, Liberty and appellee executed written amendments shortening the duration of the management agreements for the Ninth and Penn garage and the Wood–Allies garage. Specifically, on December 1, 1985, the 1977 and 1982 agreements were amended to provide for termination on October 31, 1987.

On December 30, 1985, bond counsel rendered an opinion that interest on the proposed $102,860,000 Parking System Revenue Bonds, Series 1985, was exempt from federal income tax. In issuing that opinion, bond counsel relied upon appellee's representations and certifications that the regulatory requirements for qualification of the 1985 bonds for tax-exempt status were satisfied. Included in those requirements was that any management agreement entered by appellee and garage operators for garages which were to receive the benefits of the proceeds from the sale of the bonds did not exceed a five-year duration. As part of its due diligence inquiry, bond counsel discussed the management agreements at issue in this case with appellee to satisfy itself that they were in compliance with the Internal Revenue Code regulations. Appellants have stipulated that bond counsel would not have rendered the opinion necessary to obtain tax-exempt status if it had been informed that the management contracts at issue exceeded a five-year duration.

Following the events of 1985, Alco and appellee entered into additional written management agreements for operation of the Mellon Square Garage. The first agreement commenced on April 1, 1987, and terminated on March 31, 1992. The second agreement commenced on October 1, 1989, and terminated on September 30, 1994.

The 1987 agreement between Alco and appellee expressly terminated the original, 1981 agreement, providing, "The Management Agreement by and between the Authority and the Manager dated as of November 30, 1981, as amended on March 1, 1984, December 1, 1985 and January 1, 1986 is hereby

terminated and declared null and void and of no effect." Agreement, 4/1/87, at ¶ 1. Both the 1987 and 1989 agreements between Alco and appellee were fully integrated, providing, "This instrument contains the entire and only agreement between the parties and no oral statements or representations or prior written matter not contained in this instrument shall have any force or effect. This Agreement may not be modified except in writing signed by the Authority and Manager." Agreement, 4/1/87, at ¶ 28; Agreement, 5/18/89, at ¶ 27.

When the 1989 agreement with Alco came up for termination in 1994, appellee solicited bids and awarded a new contract for operation of the Mellon Square garage to a third party. Alco exercised a right of first refusal and continues to manage the Mellon Square garage but for less compensation than that provided in the original, voided 1981 agreement.

Liberty and appellee also entered into additional agreements following the 1985 bond issue. Agreements dated April 1, 1987, for the Ninth and Penn garage and for the Wood–Allies garage, were entered and provided for termination on March 31, 1992. On May 18, 1989, the parties entered a five-year agreement for those garages which commenced on October 1, 1989, and terminated on September 30, 1994. As with the 1987 agreements with Alco, the 1987 agreements with Liberty contain identical language explicitly terminating and declaring void the original 1977 and 1983 agreements with respect to the two garages. The 1987 and 1989 agreements with Liberty also are fully integrated, containing the identical integration clause as the 1987 and 1989 agreements appellee executed with Alco.

In 1994, when the 1989 agreements with Liberty were due to terminate, appellee solicited bids and awarded a new contract for the operation of Ninth and Penn garage to a third party. Liberty exercised its right of first refusal and continues to manage the Ninth and Penn garage but for less compensation than that provided in the 1977 agree-

ment. Appellee now operates the Wood–Allies garage itself.

Appellants instituted these actions, contending that in 1985, members of appellee's board orally promised to renew the original management contracts[1] for five-year terms every one or two years through to the year 2006. Appellee filed preliminary objections against both complaints; the objections were denied without opinion. Then, depositions were taken of former members of appellee's board, Ronald C. Schmeiser, John J. Petrolias, and Robert Rade Stone, as well as Alco's president, John T. Stabile, Jr., and Liberty's president, John Cominos. Alco and Liberty moved for summary judgment, which was denied without opinion.

The actions were then consolidated for trial. Prior to trial, appellants argued that under the doctrine of the law of the case, appellee should not be allowed to raise any legal arguments raised in its preliminary objections and summary judgment motions. The trial court rejected that argument. With the parties' consent, the court heard the testimony of one witness, Ronald Schmeiser, at trial. In addition, the deposition testimony of Mr. Petrolias, Mr. Stone, Mr. Stabile, and Mr. Cominos was submitted for consideration. Finally, appellee objected to the admission of any evidence either in deposition or during trial of oral representations and agreements made prior to the execution of the 1987 and 1989 integrated, written agreements. The court noted the objection, reserved ruling on it, and heard evidence relating to the 1985 oral statements.

Mr. Schmeiser, chairman of appellee's board from 1979 until early in 1990, testified that in 1985, he made separate promises to Mr. Stabile and Mr. Cominos to continually extend the original management contracts with appellants until 2006. He stated that the promises were discussed with board members Robert Rade Stone and John J. Petrolias, were voted upon, and were passed. However, the record establishes that this oral promise was not discussed at an open

1. We use the term original management contracts to refer to the first contracts executed by the parties, as amended and extended to 2006.

board meeting, and *no minutes of the board contain a discussion of the promise.*

Further, Mr. Schmeiser's testimony about "promises" or "agreements" was undermined. He admitted that he served as chairman of the board at the pleasure of the mayor, could have been terminated at any time, and knew that he was without the power to renew the contracts if he was not on the board. Moreover, at his deposition, Mr. Schmeiser discussed his conversations with Mr. Stabile and Mr. Cominos. During his deposition, he did not characterize his 1985 statements as "agreements" to renew; rather he stated he made "assurances" that he and the other board members would "do everything within our power" to renew the management contracts with appellants. Reproduced record at 488a. At deposition, Mr. Schmeiser also stated that it was not his understanding that appellants were given actual options to renew in 1985; instead, he stated that he told Mr. Stabile and Mr. Cominos that he and the other board members would "use our best efforts to continue to renew" the management agreements. *Id.* at 505a. These statements differ significantly from Mr. Schmeiser's trial testimony that he made specific promises to grant options.

The parties stipulated to the testimony of Edison Montgomery, a board member in 1985. Montgomery attended board meetings in November and December 1985, when the bond issue was discussed and approved. At the November 20, 1985 meeting, the board was informed the management agreements for the garages were jeopardizing the tax-exempt statute of the bond issue. At that meeting, a resolution was adopted wherein the board formally approved the amendments that shortened the duration of the agreements from twenty years to one year, eleven months, effective on December 1, 1985. At no time during this meeting or any other meeting was Mr. Montgomery told of any discussions with Mr. Stabile or Mr. Cominos that the management agreements would be renewed until 2006.

Mr. Stone and Mr. Petrolias indicated in depositions that they understood that in 1985, appellants were given actual options to renew. However, they admitted that their understandings were based on information from Mr. Schmeiser rather than any direct dealings that they had with Mr. Stabile and Mr. Cominos. Similarly, the depositions of Mr. Stabile and Mr. Cominos establish that they dealt directly with Mr. Schmeiser when the contracts were re-negotiated in 1985.

Following the hearing, the trial court concluded that the alleged oral promises made in 1985 could not be used to extend the terms of the 1987 and 1989 agreements due to the parol evidence rule because the 1987 and 1989 agreements contained the above-quoted integration clause. In addition, the court concluded that the 1985 oral agreements were illegal to the extent they were entered into to circumvent federal tax law by creating management agreements that extended beyond the five-year period permitted for tax exempt status for the 1985 bond issue. This appeal followed denial of appellants' post-trial motions.

Initially, we note the following. Appellants have not contended that the 1985, 1987, and 1989 contracts were entered without consideration. While they continually underscore the fact they were not required legally to shorten the duration of the original management contracts, we find that fact irrelevant. Appellee concomitantly was not required to include the garages in the 1985 bond issue. The *quid pro quo* for the shortened terms in the management contracts was that the garages received tax-exempt bond funding for improvements.

Appellants insist that the oral representations made in 1985 by Mr. Schmeiser are enforceable. Appellants argue: 1) the parol evidence rule does not apply because both parties to the 1987 and 1989 agreements acknowledge the existence of the 1985 oral promises; 2) the trial judge was not permitted to apply the parol evidence rule based on the law of case in that there were prior rulings that the parol evidence rule did not prevent appellants from recovery herein; and 3) the oral agreements were not illegal.

We have concluded that the 1985 oral agreements are not enforceable. Before discussing the law, we make the following observations. In 1985, appellants were not

required to alter the prior management agreements that extended to 2006. They voluntarily chose to do so because they wanted funding to improve the facilities they operated. Appellants could have insisted that the original management agreements remain in effect and refused the improvements. Appellants assumed the risk that the 1985 oral representations would not be enforceable and that subsequent board members would not award them contracts. They also reaped the benefits of the improvements by continuing to manage the facilities for over nine years following the 1985 tax-free bond funding. In addition, appellee could have obtained a tax-exempt bond issue without appellants' participation by not including the garages appellants managed in the facilities to be improved by the bond funds.

■ We also reject appellants' claims of fraud and bad faith. Appellants were not forced into executing the agreements in 1987 and 1989 that terminated and declared null and void the original management agreements that extended those agreements to 2006. Moreover, the board members who allegedly orally promised to renew appellants' contracts did so. Mr. Schmeiser left the board in 1990, Mr. Stone was no longer a member after 1985, and Mr. Petrolias terminated his term on the board in 1993. Thus, no one lied to appellants. Renewals were given until 1994, when none of the individuals who made the alleged promises were in office. Appellants voluntarily assumed the risk that the board composition would change and that they would not get automatic contract renewals from the new board.

■ It is clear that the original management agreements were explicitly rendered null and void by the 1987 agreements. Appellants' right to prevail rests on the enforceability of the alleged 1985 oral promises by Mr. Schmeiser to give appellants renewed management contracts until 2006. However, the oral promise of Mr. Schmeiser, who kept his promise, *did not bind appellee.*

■ Where a municipality must execute a contract in a particular manner under legislative pronouncement, failure to comply with the pronouncement renders the contract unenforceable. *Carnegie Natural Gas Co. v. Allegheny County*, 406 Pa. 134, 176 A.2d 630 (1962); *Pittsburgh Baseball, Inc. v. Stadium Authority of Pittsburgh*, 157 Pa. Commw. 478, 630 A.2d 505, 508–509 (1993) (oral contract with a city mayor was not binding on city where the relevant city code required all contracts with the city to be in writing and signed by the mayor and head of the proper department and where the Home Rule Charter required that contracts regarding city affairs be authorized by resolution of city council).

Under section 348(c) of the Pennsylvania Parking Authority Law, 53 P.S. § 342, *et seq.*, the by-laws of parking authorities govern the manner in which those authorities may conduct business. Thus, the by-laws govern the conduct of appellee's affairs, and acts not in accordance with the by-laws cannot be enforced under the cited case law.

Appellee's by-laws in effect throughout 1985 and 1986 state, at Article II, Section 2: "Except as otherwise authorized by resolution of the Board of the Authority, *the Chairman shall sign all contracts, deeds and other instruments made by and on behalf of the Authority.*" Reproduced record at 1167a (emphasis added). The by-laws thus require that all contracts made by and on behalf of appellee must be in written form and signed by the Chairman, unless the board passed a resolution explicitly authorizing the Chairman to enter into a contract in oral form.

The record establishes conclusively that there was *no resolution* of the board which authorized Mr. Schmeiser to enter into a contract with appellants. *Id.* at 1022a. The minutes from the time period when the alleged oral agreements were formed contain no mention of any oral agreement or any board resolution regarding same. *See* R.R. at 1059a–1107a, 1121a–1169a. Thus, since the contracts were not signed by the chairman nor expressly authorized by a board resolution to be in oral form, the contracts are not binding on appellee.

■ Those who contract with a municipal corporation do so at their peril and must inquire into the powers of the corporation

and its agents to enter into the contracts. *See Innes v. School District of Nanticoke,* 342 Pa. 433, 20 A.2d 225, 227–228 (1941); *Pittsburgh Baseball, Inc. v. Stadium Authority of Pittsburgh, supra,* (owners of baseball franchise could not succeed on promissory estoppel claim against city to enforce agreement between mayor and owners because city's governing documents required such contracts to be in writing and authorized by resolution of city council; franchise owners should have known the limits on the mayor's authority to make such a promise and did not reasonably rely on mayor's alleged promise); *School District of Philadelphia v. Framlau Corp.,* 15 Pa. Commw. 621, 328 A.2d 866, 870 (1974) (plaintiff could not enforce litigation settlement agreement which was reached with president of the school board but not ratified by a majority vote of the school board; one contracting with a school district must, at his own peril, know the extent of the power of the school district's officers in making a contract).

Appellants dealt with appellee at their peril, and it was their responsibility to become knowledgeable of appellee's contracting powers and authority. Appellee's by-laws and minutes of its meetings, showing all board resolutions, were publicly available pursuant to section 264 of the Open Meeting Law in effect at that time. 65 P.S. §§ 261–269 (superseded). Alco and Liberty could have investigated their erroneous assumption that they were entering into binding agreements.

■ Based on our determination that the alleged 1985 oral promises by Mr. Schmeiser were not legally binding on appellee, we affirm the trial court's judgment. In so doing, we apply the following maxim:

> The order of a trial court may be affirmed on appeal if it is correct on any legal ground or theory, regardless of the reason or theory adopted by the trial court. *See: In Re Benson,* 419 Pa.Super. 582, 589–590, 615 A.2d 792, 795–796 (1992); *Elder v. Nationwide Ins. Co.,* 410 Pa.Super. 290, 296, 599 A.2d 996, 999 (1991). Where a trial court has reached the correct result, its order will be sustained if it can be sustained for any reason. *Turnway Corp.*

*v. Soffer,* 461 Pa. 447, 462, 336 A.2d 871, 878 (1975).

*Al Hamilton Contracting Co. v. Cowder,* 434 Pa.Super. 491, 644 A.2d 188, 190 (1994); *see also Renee Beauty Salons, Inc. v. Blose–Venable,* 438 Pa.Super. 601, 652 A.2d 1345, 1350 (1995).

■ However, in the event that the alleged oral promises were binding on the authority, we would find that the trial court correctly concluded that evidence of the alleged 1985 oral promises was not admissible to vary the termination of the fully integrated 1987 and 1989 contracts.

> Where ... alleged prior or contemporaneous oral representations or agreements concern a subject which is specifically dealt with in the written contract, and the written contract covers or purports to cover the entire agreement of the parties, the law is now clearly and well settled that in the absence of fraud, accident or mistake, the alleged oral representations or agreements are merged in or superseded by the subsequently written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence.

*HCB Contractors v. Liberty Place Hotel Associates,* 539 Pa. 395, 652 A.2d 1278, 1279 (1995).

Herein, the 1987 and 1989 contracts with integration clauses expired by their own terms in 1994. Hence, parol evidence that the agreements were to extend to 2006 is prohibited under the parol evidence rule. The evidence establishes conclusively that the alleged 1985 oral agreements were omitted deliberately from the contracts in order to qualify for tax exempt bond funding to improve the garages. Therefore, the alleged oral agreements were not mistakenly or accidentally omitted from the subsequent agreements. Furthermore, as discussed above, there was no fraud since the members of appellee's board who were involved in the 1985 representations never breached an alleged promise. The 1994 board members perpetrated no fraud upon appellants.

■ Finally, we reject appellants' attempt to apply precedent that provides that where

both parties to an integrated contract agree that an oral agreement was reached in contravention of the contract terms, the oral agreement will be enforced. Herein, *appellee* vigorously denies that any "agreements" were reached in 1985. It notes that only Mr. Schmeiser testified to the existence of oral agreements. However, appellee suggests that in light of Mr. Schmeiser's *deposition*, his *testimony* that he made promises to renew is not credible. In the deposition, Mr. Schmeiser stated that he gave Mr. Stabile and Mr. Cominos nothing more than assurances to do the best he could to obtain renewals. In the deposition, Mr. Schmeiser actually disavowed the existence of firm options to renew. Thus, Mr. Schmeiser's testimony that "agreements" were reached is seriously undermined by his deposition statements.

Mr. Petrolias and Mr. Stone had no discussions with Mr. Stabile and Mr. Cominos, and their "understanding" that options were given is irrelevant since they never made any representations to appellants. Finally, Mr. Stabile and Mr. Cominos are sophisticated businessmen who were aware that board members were appointed by the mayor and could be replaced. They knew that there was a distinct possibility that the 1985 board members would not be on future boards to extend the management contracts until 2006. Thus, the parties do not "agree" that oral "agreements" were reached in 1985 that vary the terms of the 1989 agreements.

 We also reject appellants' allegation that the trial court's application of the parol evidence rule violated the law of the case. The prior rulings on this issue were made in the context of preliminary objections and motions for summary judgment. Herein, the trial court was rendering a ruling on the parol evidence rule following trial and after consideration of all the evidence. Ordinarily, judges of coordinate jurisdiction sitting in the same case should not overrule a prior decision of another judge of that jurisdiction. *Boyle v. Steiman*, 429 Pa.Super. 1, 631 A.2d 1025, 1031 (1993). However, where a judge has entertained new evidence, the judge may overrule a decision of a judge of coordinate jurisdiction. *Boyle v. Steiman,*

*Id.*, 429 Pa.Super. at 11–12, 631 A.2d at 1031 (1993) ("Where the record is materially different from the record that was before the preceding judge, it is not improper for the succeeding judge to reach a different result.").

Finally, even if the parol evidence rule did not apply and even if oral promises were binding on appellee, we would refuse to enforce the alleged 1985 promises. Appellants are attempting enforce agreements that they knowingly entered in order to meet the requirements of the Internal Revenue Service. The evidence conclusively establishes that appellants knew the garages they managed would not qualify for tax-exempt bond funding if management contracts exceeding a five-year term were in existence. Appellants entered written agreements altering the original management contracts in order to obtain tax-exempt status from the Internal Revenue Service for the bond issue and in order to obtain funding to improve the garages. The 1985 agreements, to the extent that they can be characterized as such, are not enforceable and are void as illegal. *Gramby v. Cobb*, 282 Pa.Super. 183, 422 A.2d 889 (1980).

Decree affirmed at GD 93–13483.

Order affirmed at GD 94–12010.