**Louise HERCZEG, Individually, and as Administratrix of the Estate of Stephen M. Wagner, Deceased, and on Behalf of Patricia A. Wagner and William Wagner, the Deceased's Natural Parents, Appellant,**

v.

**HAMPTON TOWNSHIP MUNICIPAL AUTHORITY and Bankson Engineers, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued June 27, 2000.

Filed Jan. 11, 2001.

---

David G. Klaber, Pittsburgh, for appellant.

Robert J. Ray, Pittsburgh, for Bankson Engineers, appellee.

Before JOYCE, ORIE MELVIN and MONTEMURO *, JJ.

ORIE MELVIN, J.:

¶ 1 Appellant, Louise Herczeg, appeals from the trial court's Order granting Appellee's, Bankson Engineers, Inc. (Bankson), motion to dismiss based upon an affidavit of non-involvement filed pursuant to 42 Pa.C.S.A. § 7502. Appellant challenges the Order as violative of the coordinate jurisdiction rule. Alternatively, she asserts the trial court misapplied 42 Pa. C.S.A. § 7502 and erred as a matter of law in refusing to find Bankson owed the decedent a duty under the facts of this case. We affirm.

¶ 2 The facts and procedural background may be summarized as follows. In February of 1995, Hampton Township Municipal Authority (Hampton), as owner, retained Bankson to draft the plans and specifications for a water line extension project at Francis Drive in Hampton Township. Allison Park Contractors, Inc. (Allison Park) was hired by Hampton as the general contractor for the project. On March 20, 1995, Stephen M. Wagner, Appellant's decedent who was employed by Allison Park, was working in an unshored trench approximately seven feet deep laying pipe when a cave-in occurred that completely engulfed Mr. Wagner. Rescue workers were able to extricate Mr. Wagner whereupon he was life flighted to a nearby hospital. Mr. Wagner never regained consciousness and succumbed to his injuries two months later.

¶ 3 On March 14, 1997, Appellant filed a wrongful death and survival action on behalf of the decedent and his parents against Hampton and Bankson. The complaint alleged Bankson designated itself as Hampton's representative during the project and a representative of Bankson's, a professional with substantial knowledge, was present at the site on the morning of the accident. It is alleged Bankson's representative had actual knowledge that Appellant's decedent was working in a dangerously unsafe trench in that the trench contained no shoring or bracing in violation of Bankson's own specifications, federal law and industry practices. It is further claimed the risk of serious injury or death was reasonably foreseeable and Bankson's representative took no steps to warn the workers or to correct the situation. Therefore, under these circumstances Appellant asserts Bankson breached a duty owed to her decedent and is liable for the resultant death of Mr. Wagner.

¶ 4 On April 2, 1997, Bankson filed preliminary objections to the complaint, including a demurrer to the negligence count. On July 1, 1997 after consideration of the parties' briefs and oral arguments thereon the Honorable Joseph Jaffe denied the demurrer and struck the punitive damages claim without opinion or explanation. On July 21, 1997, Appellant filed an amended complaint. In Bankson's answer to the amended complaint, Bankson denied the allegations of negligence asserting that it had no knowledge of an unsafe condition, no duty regarding the allegations and that none of its services were involved in the cause of the accident. Moreover, Bankson alleged that it had no authority to control the contractor's work and never assumed by contract or conduct any responsibility for job site safety.

¶ 5 On March 30, 1998, Bankson filed a Motion to Dismiss based on affidavits of non-involvement as permitted by 42 Pa. C.S.A. § 7502. In this motion, Bankson

* Retired Justice assigned to the Superior Court.

again argued, relying on the same cases cited in its previous demurrer, it could not be held liable for Mr. Wagner's death because it never assumed by contract or conduct any responsibility for job site safety. Thus, it did not owe the contractor's employees a duty to act. On July 8, 1998, the Honorable Stanton R. Wettick issued a Memorandum and Order finding that Bankson had set forth "a *prima facie* showing that it did not assume any responsibility to render services for the protection of third persons from physical harm created by the acts of others." Certified Record at 39, Memorandum and Order dated 7/8/98. However, the court permitted Appellant an additional sixty days to conduct discovery and file affidavits or depositions "that would permit a jury to find that Bankson Engineers had undertaken any responsibility for the protection of employees of any contractor at the job site from physical harm from hazards created by the acts of others." *Id.* The court further stated:

If [Appellant] does not produce such evidence, I will consider [Appellant's] second claim that tort law imposes liability where a professional possesses special knowledge that a construction activity that he or she personally observes poses a clear, present, and imminent risk of harm to a worker at the site. In considering [Appellant's] second claim, I will assume to be true [her] allegations that the representative of Bankson Engineers was a professional with special knowledge who personally observed construction activity that posed a clear, present, and imminent risk of harm. Consequently, I will be considering only the legal issue of whether these allegations state a cause of action.

*Id.*

¶ 6 Appellant conceded she was not attempting to fasten liability based upon contractual duties or the assumption of a duty by conduct, and thus did not file any affidavits or depositions. Appellant instead merely relied on the court's state-ment that it would consider her liability theory as if all her allegations of fact were true. On December 28, 1998, the court entered an order granting Bankson's Motion to Dismiss. However, this order was interlocutory because Hampton remained in the case. Appellant sought and was granted reconsideration. However, before ruling on the reconsideration Hampton was voluntarily dismissed from the action by Appellant's filing of a praecipe with the Prothonotary on July 29, 1999. On August 29, 1999, the court entered an order stating that "[u]pon the Prothonotary's prior entry of [Appellant's] voluntary discontinuance and dismissal of [Hampton], and following reconsideration of my December 28, 1998 Memorandum and Order of Court, for the reasons set forth in my December 28, 1998 Memorandum, [Appellant's] action against Bankson Engineers, Inc. is dismissed pursuant to 42 Pa.C.S. § 7502." Certified Record at 66 (Exhibit "B" attached to Notice of Appeal). This timely appeal followed.

¶ 7 Appellant raises the following issues: 1. Does Pennsylvania law impose a duty to act reasonably on a construction site engineer where the engineer observes and has **actual knowledge** of a safety hazard related to the project that violates the engineer's own design specifications and where the engineer recognizes that imminent injury or death is reasonably foreseeable?

2. Were the issues raised by Bankson Engineers, Inc.'s Motion to Dismiss Based on Affidavit of Non–Involvement resolved in [Appellant's] favor by a previous court order overruling [Appellee's] preliminary objections, and therefore, binding upon the parties and the court under the Coordinate Jurisdiction Rule?

Appellant's Brief at 5. We will address these issues in inverse order.

¶ 8 Initially, we note this Court has not previously reviewed the procedures invoked by the trial court in addressing a motion to dismiss pursuant to 42 Pa.C.S.A.

§ 7502. The trial court likened the procedure to that of a motion for summary judgment with the only difference being its presentment at an earlier point in the litigation. We agree. In essence the procedure used by the trial court tracked Pa. R.C.P. 1035.2. The trial court allowed the filing of counter-affidavits or depositions; however, the Appellant chose to forego this opportunity and agreed to have the court decide the legal issue based upon the deemed truth of Appellant's factual averments. Accordingly, we will apply the same standard of review as if the Order in question had granted summary judgment.

■ ¶ 9 We begin our analysis by first addressing whether the coordinate jurisdiction rule was violated. Appellant contends the legal authorities cited and arguments advanced in support of Bankson's motion to dismiss pursuant to 42 Pa.C.S.A. § 7502 were essentially identical to those cited and argued in support of its preliminary objections in the nature of a demurrer. Thus, the subsequent Order entered by Judge Wettick impermissibly overturned the prior order overruling Bankson's preliminary objections. We cannot agree.

■ ¶ 10 Ordinarily, judges of coordinate jurisdiction sitting in same case should not overrule prior decision of another judge of that jurisdiction. *Alco Parking Corp. v. Public Parking Auth. of Pittsburgh,* 706 A.2d 343 (Pa.Super.1998). It "is a rule of sound jurisprudence based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." *Commonwealth v. Starr,* 541 Pa. 564, 574, 664 A.2d 1326, 1331 (1995). "[T]his rule is not intended to preclude granting summary judgment following the denial of preliminary objections." *Rosenfield v. Pennsylvania Automobile Ins. Plan,* 431 Pa.Super. 383, 636 A.2d 1138, 1142 (1994).

Where the motions differ in kind, as preliminary objections differ from motions for judgment on the pleadings, which differ from motions for summary judgment, a judge ruling on a later motion is not precluded from granting relief although another judge has denied an earlier motion. However, a later motion should not be entertained or granted when a motion of the same kind has previously been denied, unless intervening changes in the facts or the law clearly warrant a new look at the question.

*Abbott v. Anchor Glass Container Corp.,* 758 A.2d 1219, 1222–23 (Pa.Super.2000) (quoting *Goldey v. Trustees of the University of Pennsylvania,* 544 Pa. 150, 155–156, 675 A.2d 264, 267 (1996)).

■ ¶ 11 In the present case the motions differed in kind. "When reviewing preliminary objections the trial court looks to the pleadings, but, in considering a motion for summary judgment the trial court weighs the pleadings, depositions, answers to interrogatories, admissions and affidavits." *Rosenfield,* 636 A.2d at 1142. Following the denial of Bankson's preliminary objections, Bankson filed an answer to Appellant's complaint and submitted along with its Motion to Dismiss Pursuant to 42 Pa.C.S.A. § 7502 affidavits of two of its employees disavowing any involvement in the cause of the decedent's death. Thus, the record before the court was now greater and the issue more narrowly defined. Accordingly, we find the trial court did not improperly overrule the decision on preliminary objections by granting Bankson's motion to dismiss, which was in the nature of a motion for summary judgment.

¶ 12 Having determined the procedure utilized by the trial court was in the nature of a motion for summary judgment, we now proceed to examine whether the instant Order was properly granted. Our standard of review following the grant of summary judgment is well settled. Summary judgment may only be granted in cases where it is clear and free from doubt the moving party is entitled to judgment as a matter of law. *Sebelin v. Yamaha Motor Corporation,* 705 A.2d 904 (Pa.Super.1998). Applying the same standards

as the trial court, we must accept as true all well-pleaded facts in the non-moving party's pleadings, giving the non-moving party the benefit of all reasonable inferences to be drawn therefrom. *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36 (Pa.Super.2000). An appellate court may disturb the order of the trial court granting summary judgment only where there has been an error of law or a clear or manifest abuse of discretion. *Id.* Finally, in considering the trial court's ruling, we are not bound by the court's conclusions of law, but may draw our own inferences and reach our own conclusions. *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1035–36 (Pa.Super.1999). Our scope of review in this matter is plenary. *Standish v. American Mfrs. Mutl. Ins. Co.*, 698 A.2d 599, 600 (Pa.Super.1997).

¶ 13 In order to establish a cause of action in negligence, a plaintiff bears the burden of demonstrating that there was a duty or obligation recognized by law, breach of that duty by the defendant, a causal connection between the defendant's breach of that duty and the resulting injury, and actual loss or damage suffered by the complainant. *First v. Zem Zem Temple*, 454 Pa.Super. 548, 686 A.2d 18, 21 (1996), *appeal denied*, 549 Pa. 701, 700 A.2d 441 (1997). At issue here is the trial court's determination Appellant failed to demonstrate a duty or obligation recognized by law.

¶ 14 Whether a duty exists under a particular set of facts is a question of law. *Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453, 457 (Pa.Super.1997). "It has long been hornbook law that a duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *Id.* (quoting *Amarhanov v. Fassel*, 442 Pa.Super. 111, 658 A.2d 808, 810 (1995)).

When considering the question of duty, it is necessary to determine whether a defendant is under any obligation for the benefit of the particular plaintiff ... and, unless there is a duty upon the defendant in favor of the plaintiff which has been breached, there can be no cause of action based upon negligence. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk and the public interest in the proposed solution. Our duty analysis depends on many factors and is necessarily rooted in public policy considerations, i.e., our ideas of history, morals, justice, and society in general in determining where the loss should fall.... Furthermore, duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the question.... To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times.

*Campo v. St. Luke's Hosp.*, 755 A.2d 20, 24 (Pa.Super.2000) (citations and quotation marks omitted).

¶ 15 The courts of this Commonwealth have consistently refused to impose a duty on design professionals to protect workers from hazards on a construction site unless there was an undertaking, either by contract or course of conduct to supervise or control the construction and/or to maintain safe conditions on the site. *Young v. Eastern Engineering and Elevator Co., Inc.*, 381 Pa.Super. 428, 554 A.2d 77, 79 (1989). In *Young*, a construction worker was seriously injured when he fell through a twenty-inch gap in the drywall surrounding the elevator shaft on which he was working. Young's injuries were the result of defective construction and/or inadequate safety precautions by the contractor and subcontractors. *Id.* at 78. Because the architect had no contractual duty to supervise the actual construction of the building, this Court found that "an architect is not under a duty to notify workers or employees of the contractor or subcontractor of hazardous conditions on the construction site." *Id.* at 81. *Cf. Heath v. Huth Engineers, Inc.*, 279 Pa.Super. 90, 420 A.2d 758 (1980)

(holding engineer liable for negligence where contract between engineer and sewer authority provided that engineer supervise work, periodically inspect it, and assist in safeguarding owner against defects by contractor).

¶ 16 Appellant argues the traditional principles of negligence law should imposes a duty on an engineer to exercise reasonable care for the safety of the general contractor's workers when the engineer has actual knowledge of dangerous working conditions that create a foreseeable risk of serious injury to those worker's. She submits this is true even where the contract places the responsibility for safety on the general contractor and the engineer's plans and specifications did not create the dangerous conditions. We cannot agree.

¶ 17 Appellant offers in support of her argument the cases of *Balagna v. Shawnee County*, 233 Kan. 1068, 668 P.2d 157 (1983) and *Carvalho v. Toll Brothers and Developers*, 143 N.J. 565, 675 A.2d 209 (1996), wherein the Kansas and New Jersey Supreme Courts fastened a duty upon supervising engineers based in part upon their actual knowledge of dangerous trench conditions. In *Balagna*, where a worker was killed when the trench in which he was working caved in, the issue was whether the architect/engineer was liable for the contractor's failure to follow required safety practices. *Balagna*, 668 P.2d at 162. In that case, it was asserted that liability existed because of a contractual duty to supervise and because the architect failed to take any action after discovering that the contractor was not following proper safety practices in the trenching operation. *Id.* The court quoted an earlier Kansas case stating in part, "as a professional, an architect cannot stand idly by with actual knowledge of unsafe practices on the job site and take no steps to advise or warn the owner or contractor." *Balagna*, 668 P.2d at 163 (quoting *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 233 Kan. 206, 662 P.2d 243 (1983)). The court reversed

the grant of summary judgment because it believed a duty was created in the engineer to take some reasonable action to prevent injury, and it was a question for the jury as to whether the engineer's decision not to warn the workers was reasonable under the circumstances.

¶ 18 Nonetheless, even the *Balagna* court recognized:

that the great weight of authority supports the rule that an [engineer] does not, by reason of his supervisory authority over construction, assume responsibility for the day-to-day methods utilized by the contractor to complete the construction. The [engineer's] basic duty is to see that his employer gets a finished product which is structurally sound and which conforms to the specifications and standards. Any duty that the [engineer] may have involving safety procedures of the contractor must have been specifically assumed by the contract or must have arisen by actions outside the contract. In determining whether the [engineer's] contractual duty to supervise the construction includes the safety practices on the jobsite, the [engineer] may intentionally, or impliedly by his actions, bring the responsibility for safety within his duty of supervision. The factors which would appear to be relevant in any case where an attempt is made to expand the [engineer's] liability beyond the specific provisions of the employment contract are set forth [as follows:]

(1) actual supervision and control of the work;

(2) retention of the right to supervise and control;

(3) constant participation in ongoing activities at the construction site;

(4) supervision and coordination of subcontractors;

(5) assumption of responsibility for safety practices;

(6) authority to issue change orders; and

(7) the right to stop the work.

*Balagna,* at 1074–1075, 668 P.2d at 163.

¶ 19 In *Carvalho, supra,* another trench cave-in case, the New Jersey Supreme Court reached a similar conclusion. Specifically, the court stated:

> We conclude that considerations of fairness and public policy require imposing a duty on [the engineer] to exercise reasonable care to avoid the risk of injury on the construction site. The risk of serious injury from the collapse of an unstable trench was clearly foreseeable. [The engineer] had explicit responsibilities to have a full-time representative at the construction site to monitor the progress of the work, which implicated work-site conditions relating to worker safety. Those responsibilities related to the condition of trenches, the handling of utility lines crossing trenches, and whether measures to shore up and stabilize trenches through the use of a trench box were necessary. The engineer had sufficient control to halt work until adequate safety measures were taken. There was a sufficient connection between the engineer's contractual responsibilities and the condition and activities on the work site that created the unreasonable risk of serious injury. Further, the engineer, through its inspector, was on the job site every day, observed the work in the trench, and, inferably, had actual knowledge of the dangerous condition.

*Carvalho,* 143 N.J. at 577–78, 675 A.2d at 214–15.

¶ 20 We are not persuaded that the rationales expressed in these cases warrant the establishment of a new rule of law fastening liability based strictly upon an assertion of actual knowledge of unsafe work-site conditions. At least with respect to *Carvalho* the presence of actual knowledge of the risk of harm was but one of the elements considered in the court's assessment of the fairness of imposing a duty of care under the circumstances. Other factors considered were the relationship between the parties and the element of control flowing from the relationship and the opportunity and capacity of the defendant to have avoided the risk. A closer examination of *Carvalho* reveals the court placed equal if not greater weight on the existence of conduct by the engineer, combined with its contractual responsibilities, which the court found implied that the engineer assumed responsibility for work-site safety. For instance, the court observed that the engineer was contractually required to be at the site everyday to monitor the progress of the work. *Carvalho,* 143 N.J. at 577–78, 675 A.2d at 214–15. In addition, the Court pointed out that the contract between the township and the general contractor for the project gave the engineer the authority to stop the work at any time, *id.* at 576, 675 A.2d at 213, remarking that the engineer's supervisory responsibility "necessarily entailed the observation of existing conditions and the actual performance of the work undertaken by the workers at the site." *Id.* at 574, 675 A.2d at 212. The Court further stressed the fact that the engineer was aware that similar trenches had collapsed in other areas of the construction site several times due to unstable trench conditions. *Id.* at 576, 675 A.2d at 213. The Court determined that the engineer's responsibilities for ensuring compliance with the plans and rate of work progress created an "overlap of work-progress considerations and work-safety concerns" justifying imposition of a duty of care to prevent the risk of harm. *Id.* at 575, 675 A.2d at 213.

¶ 21 The instant case presents a very different factual scenario. Other than to make two visits per month to observe the progress and quality of the work, Bankson had no contractual agreement with Hampton or Allison Park to supervise the work or provide safety oversight. Further, Bankson was not required to have a full-time representative on site. Neither did Bankson participate in, nor interfere with, the means or methods of

the trenching work being performed by the contractor. Unlike *Carvalho*, Bankson had no opportunity or capacity to exercise control over the manner or means by which plaintiff chose to perform the trenching work. To the contrary, pursuant to the contract documents, the control of the work and the safety of the workers fell squarely upon the contractor. Moreover, Bankson was not given authority to stop the work upon discovery of a safety violation. On these facts, Bankson did not by contract or conduct, undertake to enforce or supervise safety procedures such as would impose a duty on Bankson to exercise reasonable care for the contractor's workers safety. In fact, Appellant does not even contend Bankson assumed any responsibility for safety at the worksite. Rather, Appellant would have us establish a duty premised solely on the engineer's presence at the time of the accident and his actual knowledge of a dangerous condition created by the contractor's failure to follow proper safety practices.

¶ 22 In general, *Balagna* and *Carvalho* do not represent a significant departure from the present state of Pennsylvania law on this subject. However, we reject any notion that a duty arises based solely upon an engineer's actual knowledge of dangerous conditions. Stated another way, such knowledge, in and of itself, does not create a tort duty. The decisions of the appellate courts of this Commonwealth concerning a design professional's duty are not dependent upon the presence or absence of actual knowledge of unsafe working conditions. We believe such a notion adds nothing new to the duty analysis. If someone is under no legal duty to act, it matters not whether that person is actually aware of a dangerous condition. *See* Restatement (Second) of Torts § 314 (1965) (defining what is known as the common law nonfeasance rule). Conversely, if someone by contract or course of conduct has undertaken the responsibility for worker safety that person may still be liable even in the absence of actual knowledge of the dangerous condition if they should have known of the condition. "Actual knowledge" in our view merely relates to the element of the foreseeability of the risk of harm. Thus, we would agree with the trial court's assessment that "there is not a great deal of difference between an 'actual knowledge' standard and a 'should have known' standard".... Trial Court Opinion and Order of Court, 12/28/98, at 14. Even assuming, as we must, that Bankson had actual knowledge of the unsafe nature of the trench, it does not follow that we must hold Bankson responsible for the safety of the construction workers where those responsibilities were expressly undertaken by the contractor. This is especially true where the facts do not indicate the engineer took any actions that can be construed as impliedly assuming responsibility for construction-site safety. Accordingly, we find no error in the trial court's Order dismissing Bankson from the case.

¶ 23 Order affirmed.