630 A.2d 505

PITTSBURGH BASEBALL, INC., trading as Pittsburgh Associates and Pittsburgh Steelers Sports, Inc.

v.

STADIUM AUTHORITY OF the CITY OF PITTSBURGH, a public body, and the City of Pittsburgh, a municipal corporation.

Appeal of PITTSBURGH BASEBALL, INC., trading as Pittsburgh Associates, Appellant.

Commonwealth Court of Pennsylvania.

Argued March 2, 1993.

Decided Aug. 4, 1993.

David L. McClenahan and Robert L. Byer, for appellant.

J. Russell McGregor, Jr., for appellee.

Before DOYLE and PALLADINO, JJ., and LORD, Senior Judge.

PALLADINO, Judge.

Pittsburgh Baseball, Inc., trading as Pittsburgh Associates (Pittsburgh Associates) appeals an order of the Court of Common Pleas of Allegheny County (trial court) sustaining preliminary objections in the nature of a demurrer to three counts of an eight-count second amended complaint, and dismissing said counts.[1]  We affirm.

Pittsburgh Associates, which owns the Pittsburgh Pirates (Pirates) baseball franchise, commenced this equity action against the City of Pittsburgh (City) and the Stadium Authority of the City of Pittsburgh (Stadium Authority) (collectively, Defendants) in January 1992.  In general, the eight-count second amended complaint alleges Defendants breached various agreements concerning Pittsburgh Associates' purchase of the Pirates and Defendants' operation of Three Rivers Stadium.

The three dismissed counts (which alternatively allege breach of contract, promissory estoppel, and quasi-contract) concern an alleged oral promise by the late Mayor Richard S. Caliguiri, on behalf of the City, to provide $4,200,000 to Pittsburgh Associates in exchange for the latter's agreement to purchase the Pirates and keep the team in Pittsburgh.

The facts underlying these counts, as alleged in the second amended complaint, can be summarized as follows.  In October 1984, the majority stockholder of the Pittsburgh Athletic Company, Inc. (Athletic Company), which then held the Pirates franchise, announced that he intended to sell his family's interest in the team.  After unsuccessfully attempting to sell the team to local investors, the majority stockholder announced, in June 1985, that he was seeking out-of-town pur-

1. In *Pittsburgh Baseball, Inc. v. Stadium Authority of the City of Pittsburgh,* 152 Pa.Commonwealth Ct. 366, 618 A.2d 1248 (1992), we stayed further proceedings in the trial court on the remaining counts pending resolution of this appeal.

chasers, even if those purchasers intended to move the Pirates to another city.

In response to this announcement, Mayor Caliguiri and other City representatives searched for local investors to purchase the team. In pursuit of this objective, Mayor Caliguiri publicly indicated that the City would provide substantial financial support to the purchasers. In reliance upon Mayor Caliguiri's commitment of financial assistance, in November 1985 a group of local companies formed Pittsburgh Associates and its general partner, Pittsburgh Baseball, Inc. (PBI), for the purpose of purchasing the team and keeping the Pirates in Pittsburgh.

It is alleged that in negotiations both before and after the formation of Pittsburgh Associates, Mayor Caliguiri firmly promised that the City would provide the partnership with $25,000,000 towards the purchase and operation of the Pirates. In return, Pittsburgh Associates would contribute $26,000,000. Pittsburgh Associates avers that the City Council of Pittsburgh (City Council) was aware of Mayor Caliguiri's promise.

In reliance upon Mayor Caliguiri's express promise to provide $25,000,000 in capital, Pittsburgh Associates entered into an asset purchase agreement with the Athletic Company on December 13, 1985. On December 24, 1985, the Urban Redevelopment Authority of Pittsburgh (URA) and PBI entered into an equity participation loan agreement. Under the terms of that agreement, the URA, on behalf of the City, agreed to lend PBI $25,000,000. Of that amount, $20,000,000 was in the form of an unconditional loan. The remaining $5,000,000 took the form of a conditional loan, which the URA would lend to PBI if the Stadium Authority was able to sell or refinance Three Rivers Stadium.

Specifically, the second amended complaint alleges, in pertinent part:

41. The closing for the Purchase Agreement was scheduled for April 1986. As of that time, the Stadium Authority had been unable to sell or arrange other financing for the Stadium. Consequently, the URA indicated that it would

present Pittsburgh Associates with the sum of only $20,000,-000 at the closing, $5,000,000 less than the original $25,000,-000 commitment made by Mayor Caliguiri.

42.  Prior to the scheduled closing of the Purchase Agreement, the limited partners of Pittsburgh Associates met with Mayor Caliguiri. At that meeting, the limited partners informed Mayor Caliguiri that the Pirates' operating expenses were continuing to rise at a substantial rate and that the economic viability of the team required the City to provide the full $25,000,000 originally committed. The limited partners expressly explained that Pittsburgh Associates could not and would not close the Purchase Agreement without the City's commitment to provide the remaining $5,000,000 on an unconditional basis.

43.  In response, Mayor Caliguiri promised Pittsburgh Associates that if it agreed to close the Purchase Agreement and purchase the Pirates, the City would unconditionally provide Pittsburgh Associates with additional capital of $5,000,000.

44.  In reliance upon that commitment, Pittsburgh Associates purchased the Pittsburgh Pirates.

45.  Thereafter, in connection with the subsequent buy out of several limited partners and associated financial transactions, the obligation of the City was reduced from $5,000,000 to $4,200,000.

46.  Mayor Sophie Masloff, Mayor Caliguiri's successor, and other representatives of the City and the Stadium Authority have repeatedly acknowledged and reaffirmed the City's obligation to provide Pittsburgh Associates with additional capital in the amount of $4,200,000 ...

49.  Based on information and belief, Pittsburgh Associates avers that the City Council in office during 1986 knew, and that successive City Councils also have known, of Mayor Caliguiri's $4,200,000 commitment to Pittsburgh Associates. Despite this knowledge, no City Council has ever taken any action to repudiate, object to or deny the validity of that contract.

50. Since April 1986, Pittsburgh Associates has relied to its detriment upon Mayor Caliguiri's promise that the City would provide the $4,200,000 ...

53. ... despite Pittsburgh Associates' numerous requests over six years to obtain those funds so as to make the Pittsburgh Pirates a viable, competitive baseball club, the City has failed to provide Pittsburgh Associates with the promised $4,200,000.

Defendants filed preliminary objections in the nature of a demurrer to the three counts averring, in general, that Pittsburgh Associates had failed to state a cause of action upon which relief could be granted. In a written opinion in support of its order sustaining Defendants' preliminary objections to the three counts, the trial court made the following conclusions. As to the breach of contract and promissory estoppel counts, the trial court concluded that no binding contract existed under Article XV, Section 1 of the act commonly referred to as the Second Class City Code (Code)[2] and Sections 510 and 513 of the Home Rule Charter of the City of Pittsburgh (Charter), §§ 510, 513.[3] The trial court added,

**2.** Article XV, Section 1 of the Act of March 7, 1901, P.L. 20, *as amended,* 53 P.S. § 23302, stated, "[a]ll contracts shall be in writing, signed and executed in the name of the city by the mayor and head of the proper department. No contracts shall be entered into or executed directly by the councils or any committee thereof." However, this section was repealed by Section 1 of the Act of July 22, 1965, P.L. 234. The subject matter of Article XV, Section 1 now appears in Section 2 of the Act of July 22, 1965, P.L. 234, *as amended,* 53 P.S. § 23308.1, which states, in pertinent part, "[e]very contract relating to city affairs shall be authorized by general or specific ordinance of council and shall be let in the manner prescribed by council ..."

**3.** Section 510 provides, "[e]very contract relating to City affairs shall be authorized by resolution of Council. No contract shall be entered into or executed directly by Council or any committee of Council."

Section 513 provides:
[n]o contract entered into by the City after effective date of this Charter shall be enforceable in any manner against the City unless the contract is in compliance with law and the provisions of this Charter. However, Council, by resolution approved by two-thirds of its members and the Mayor, may authorize payment of a claim for services rendered or materials furnished in reliance on contracts made by City officers or agents in good faith without authority or in

484

with respect to the promissory estoppel count, that "[d]espite several attempts, [Pittsburgh Associates] has failed to plead any facts which would establish that it justifiably relied on the Mayor's alleged promise." As to the quasi-contract count, the trial court concluded that such an claim was unpersuasive since any benefits conferred on the City by the Pirates were indirect.

■ On appeal to this court,[4] the issues presented are whether Pittsburgh Associates has sufficiently pleaded: 1) a breach of contract claim, 2) a promissory estoppel claim, or 3) a quasi-contract claim.

■ As to the breach of contract claim, Pittsburgh Associates argues that the trial court erred by focusing on the the statutory provisions applicable to the City's contracts. Instead, Pittsburgh Associates contends that a defectively executed contract (or "irregular contract") with a municipality is binding if ratified, and in this instance City Council ratified the irregular contract by its failure to take action. Pittsburgh Associates cites a single Pennsylvania case, *Eckert v. Pierotti*, 123 Pa.Commonwealth Ct. 8, 553 A.2d 114 (1989), for the proposition that a municipality can ratify an irregular contract by inaction. In that case, we quoted extensively from 10A Eugene McQuillin, *The Law of Municipal Corporations* §§ 29.104–29.106 (3rd ed.), including the following: " '[t]he ratification of a contract by the municipal corporation may be made by the affirmative action of the proper officials, or by any action *or nonaction which in the circumstances amounts to an approval of the contract.'* Id., § 29.106 (footnotes omitted)." *Eckert,* 123 Pa.Commonwealth Ct. at 18, 553 A.2d at 118 (emphasis added).

excess of authority so long as the contract could have been properly authorized.

4. Our scope of review of a trial court's order sustaining preliminary objections is limited to determining whether the trial court committed an error of law or abused its discretion. *Faust v. Commonwealth,* 140 Pa.Commonwealth Ct. 389, 592 A.2d 835 (1991), *petition for allowance of appeal denied,* 530 Pa. 647, 607 A.2d 257 (1992). In making this determination, we must accept as true all well-pleaded facts of the opposing party. *Id.*

Since the township in *Eckert* formally approved and ratified the contract at issue in that case, we do not find that case to be persuasive. With respect to the numerous cases Pittsburgh Associates has cited from other jurisdictions, we note that most, if not all, of those cases appear to have a common denominator; namely, that municipal inaction *plus* the acceptance of benefits under the contract may constitute ratification. Since we conclude later in this opinion that actions by Pittsburgh Associates did not confer any direct benefits on the City, we are not persuaded by those cases from other jurisdictions. In any event, we conclude that on the facts pleaded, City Council's failure to take action does not constitute "non-action which in the circumstances amounts to an approval of the contract". As such, the trial court did not err in dismissing the breach of contract count.

■ As to the promissory estoppel claim,[5] we merely note that "it is a general and fundamental principle of law that persons contracting with a municipal corporation must at their peril inquire into the power of the corporation or its officers to make the contract or incur the debt." *Pittsburgh Paving Co. v. City of Pittsburgh*, 332 Pa. 563, 569, 3 A.2d 905, 908 (1938). *See also School District of Philadelphia v. Framlau Corp.*, 15 Pa.Commonwealth Ct. 621, 627–28, 328 A.2d 866, 870 (1974) ("[o]ne who contracts with a school district must, at his peril, know the extent of the power of the school district's officers in making the contract."). As such, we conclude that Pittsburgh

5. Pennsylvania has adopted the doctrine of promissory estoppel as it appears in the Restatement (Second) of Contracts § 90 (1979). *Travers v. Cameron County School District*, 117 Pa.Commonwealth Ct. 606, 544 A.2d 547 (1988). That section states, in pertinent part:

§ 90. **Promise Reasonably Inducing Action or Forbearance**
(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

A comment to that section explains, "[t]he principle of this Section is flexible. The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance ..." Restatement (Second) of Contracts § 90 cmt. b (1979).

Associates has failed to sufficiently plead that it reasonably relied on Mayor Caliguiri's alleged oral promise, and the trial court did not err in dismissing the promissory estoppel count.

As to the quasi-contract claim, Pittsburgh Associates argues that it confers enormous benefits on the City by keeping the Pirates in Pittsburgh, including millions of dollars "through taxes on ticket sales" and money spent on "food, hotel rooms, souvenirs, gasoline and other goods and merchandise sold by local vendors." Second amended complaint at 21. Thus, Pittsburgh Associates contends that the City would be unjustly enriched if it were able to repudiate Mayor Caliguiri's promise after accepting those benefits.

Quasi-contracts are contracts which are implied in law for reasons of justice. *Department of Public Welfare v. Moran*, 84 Pa.Commonwealth Ct. 554, 480 A.2d 356 (1984). In *J.A. & W.A. Hess, Inc. v. Hazle Township*, 484 Pa. 628, 633, 400 A.2d 1277, 1279 (1979), our supreme court, quoting *Luzerne Township v. Fayette County*, 330 Pa. 247, 199 A. 327 (1938), stated:

> [i]t is true that, in order to avoid results involving obvious injustice, the courts of some jurisdictions, including our own, have held that where a municipality or other local agency of government has voluntarily accepted and retained the benefits of a contract which it had the power to make but which was defective in the method of its execution and consequently invalid, *the party who, by furnishing labor or material, has conferred such benefits may recover compensation therefor in a suit*, not on the invalid contract itself, but upon a quantum valebat, quantum meruit, or for money had and received ..."

(Emphasis added.)

Pittsburgh Associates' argument begins with a false premise when it claims that it confers enormous benefits on the City. Clearly, it is the Pirates' fans, and not Pittsburgh Associates, that pay the taxes on ticket sales and make the other expenditures. Pittsburgh Associates cites to no cases from Pennsylvania that hold that a party which bestows an indirect benefit

is entitled to a quasi-contract remedy, and the above-quoted language from *Hess* plainly militates against such an approach. As such, the trial court did not err in dismissing the quasi-contract count.

Accordingly, we affirm the order of the trial court.

## ORDER

AND NOW, August 4, 1993, the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is affirmed.

Jurisdiction relinquished.

McGINLEY and PELLEGRINI, JJ., did not participate in the decision of this case.

DOYLE, Judge, concurring and dissenting.

Respectfully, I concur and dissent.

With regard to the contract claim, I agree with the majority that no Pennsylvania case has been cited as authority that mere municipal inaction can constitute ratification of a defective contract. And, I further believe that such a policy would be unwise. In fact, such principle has been soundly rejected in the context of zoning law where a landowner has attempted to assert his acquisition of vested rights due to municipal inaction. *See e.g., Crawford Appeal,* 110 Pa.Commonwealth Ct. 51, 531 A.2d 865 (1987), *petition for allowance of appeal denied,* 518 Pa. 656, 544 A.2d 1343 (1988). Accordingly, I concur in the majority's holding that the demurrer was properly sustained as to the contract count.

I differ, however, from the majority with regard to the analysis of the other two counts at issue here. Considering first the promissory estoppel count, I would conclude that Pittsburgh Baseball, Inc. (PBI) has pled facts which, if believed by a jury, would be sufficient to sustain its cause of action. Paragraphs 42 through 44 of the second amended complaint state:

42. Prior to the scheduled closing of the Purchase Agreement, the limited partners of Pittsburgh Associates met with Mayor Caliguiri. At that meeting, the limited partners informed Mayor Caliguiri that the Pirates' operating expenses were continuing to rise at a substantial rate and that the economic viability of the team required the City to provide the full $25,000,000 originally committed. The limited partners expressly explained that Pittsburgh Associates could not and would not close the Purchase Agreement without the City's commitment to provide the remaining $5,000,000 on an unconditional basis.

43. In response, Mayor Caliguiri promised Pittsburgh Associates that if it agreed to close the Purchase Agreement and purchase the Pirates, the City would unconditionally provide Pittsburgh Associates with additional capital of $5,000,000.

44. In reliance upon that commitment, Pittsburgh Associates purchased the Pittsburgh Pirates.

While it is true, as the majority states, that those contracting with a municipality must inquire into the authority of its officers, and while I agree that such inquiry is relevant on the issue of whether PBI's reliance was reasonable, in my view the facts alleged here are sufficient to allow a jury to decide the level of inquiry which actually took place and, hence, the reasonableness of the reliance. Certainly in this case on the facts pled, such reliance was reasonable if there was such implied or apparent authority.

With regard to the quasi-contract claim, the majority concludes that because PBI has not *directly* conferred a benefit on the City, it cannot prevail on this theory. Again, I disagree. The language in *J.A. & W.A. Hess, Inc. v. Hazle Township*, 484 Pa. 628, 400 A.2d 1277 (1979), quoted by the majority says that the party who has conferred benefits may recover compensation. The case does not say that the party conferring the benefits must confer them directly. What purpose does it serve to quibble over whether the benefits were conferred on the City by the Pirates' fans, or by PBI? What is abundantly clear is that except for PBI, the Pirates'

fans would not have been able to purchase tickets, baseball memorabilia or other goods and services attendant to their support of the team's endeavors. Nor could the City itself resonate with civic pride over having a professional baseball team carry its name in the major leagues. The majority correctly notes that the theory of quantum merit is rooted in justice. If the City, and its commercial sector would be permitted to reap enormous benefits without living up to its part of the bargain merely because PBI's conference of those benefits upon it is indirect, it would be, in my view, a gross miscarriage of justice.

The complaint in this case is well pled. The allegations are compelling. PBI deserves its day in court. Consequently, I would reverse the trial court's ruling on the counts pertaining to promissory estoppel and quasi-contract and remand for further proceedings.