Robert W. McGAFFIC, Executor of the Estate of Eleanor L. McGaffic, Deceased, and Robert W. McGaffic, in his own right, and George G. Love

v.

CITY OF NEW CASTLE, Appellant.

Commonwealth Court of Pennsylvania.

Argued Jan. 28, 2009.

Decided May 14, 2009.

---

**1050**

Samuel P. Kamin, Pittsburgh, for appellant.

Jonathan Solomon, New Castle, for appellee.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, SIMPSON, Judge, LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge SIMPSON.

In this interlocutory appeal by permission, the City of New Castle (City) seeks review of a verdict in favor of Robert W. McGaffic, Executor of the Estate of Eleanor L. McGaffic, Deceased, and Robert W. McGaffic, in his own right, and George G. Love (Property Owners), from a non-jury trial conducted in the Court of Common Pleas of Lawrence County (trial court). The bifurcated trial was limited to two questions: 1) whether the Property Owners' complaint alleging breach of contract was timely filed within the four-year statute of limitations, and 2) whether the City entered into an enforceable contract where the contract was not signed by the City Controller.[1] Following a verdict for the Property Owners on both issues, the City sought an interlocutory appeal, which the trial court certified pursuant to Pa. R.A.P. 1311. Thereafter, this Court granted the City's petition for permission to appeal. Upon review, we affirm the trial court.

## I. Background

### A. Redevelopment

The Centennial Building (Property) was a commercial rental property owned by the Property Owners in the downtown section of the City. In 1958, the New Castle City Council (City Council) created the Redevelopment Authority of the City of New Castle (RANC) to conduct urban renewal activities in the City. RANC participated in redevelopment activities with financial assistance from the United States Department of Housing and Urban Development (HUD), the Commonwealth of Pennsylvania, and the City.

In 1968, RANC filed a development plan for the City's downtown area. Subsequently, RANC informed the Property Owners and their tenants that the Proper-

---

1. The trial was limited to these questions as a verdict in favor of the City on either question would resolve this matter and avoid a lengthy trial on the issue of whether the Property Owners had standing to sue as third-party beneficiaries to the Urban Redevelopment Closeout Agreement. *See* Reproduced Record (R.R.) at 154a (trial court's order granting City's birfucation motion).

ty would be acquired, the tenants relocated, and the building demolished as part of the redevelopment of the City. By 1973, RANC acquired 96% of all properties located within the redevelopment area and had taken and destroyed all but five of the 212 buildings scheduled for demolition. At this time, RANC had neither acquired nor destroyed the Property.

By the end of 1974, HUD funds were no longer available to RANC. In 1977, the City and RANC entered into the Urban Redevelopment Closeout Agreement (Closeout Agreement). The Closeout Agreement, which is the basis for the present controversy, stated, "[a]ny costs or obligations incurred in connection with the said program with respect to claims which are disputed, contingent, unliquidated or unidentified, and for the payment of which insufficient program funds have been reserved ... shall be borne by the [City]." Reproduced Record (R.R.) at 878a. The Closeout Agreement required the City to assume debts and liabilities for RANC and allowed the City to receive HUD funds directly. The City Council approved and the Mayor signed the Closeout Agreement, though the City Controller did not.

## B. *De Facto* Taking Litigation

In 1978, RANC publicly announced it no longer intended to take the Property. Subsequently, the Property Owners filed a Petition of Appointment of Viewers against RANC and the City to determine if a *de facto* taking of the Property occurred. At the time, the Property Owners failed to raise the existence of the Closeout Agreement, and the City was dismissed from the

action. However, the trial court left open the possibility of later review of the City's liability if it found a *de facto* taking occurred and RANC could not pay just compensation because the City withheld the funds.

The *de facto* taking litigation continued against RANC alone. In 1986, the trial court found a *de facto* taking of the Property occurred.

In 1994, the Board of View issued a report valuing the Property at $184,000 at the time of the taking. After a series of appeals and motions by RANC, the trial court awarded delay compensation resulting in a final damage award of $ 1,254,007.92.[2] RANC appealed, and this Court affirmed the trial court with minor adjustments. *See McGaffic v. Redev. Auth. of the City of New Castle*, 732 A.2d 663 (Pa. Cmwlth.1999).

## C. Contract Litigation

RANC lacked funds to pay the *de facto* taking award, and the City refused to honor its obligation under the Closeout Agreement. Property Owners, as third-party beneficiaries of the Closeout Agreement, subsequently filed suit against the City.

 Following a non-jury trial, limited to the issues of whether the Property Owners timely filed their complaint and whether the Closeout Agreement was enforceable, the trial court ruled in favor of the Property Owners on both issues. Thereafter, the trial court certified its order for permissive interlocutory appeal. We granted that permission.[3]

---

**2.** The total amount due as of March 31, 2004 was $1,715,621.18. R.R. at 828a.

**3.** Permissive interlocutory review of the non-jury verdict prior to judgment is equivalent to consideration of post-trial motions seeking judgment notwithstanding the verdict. Judgment notwithstanding the verdict may be en-

tered on two bases: where the movant is entitled to judgment as a matter of law; or where the evidence is such that no two reasonable persons could disagree the verdict should have been rendered for the movant. *Com., Dep't of Gen. Serv. v. U.S. Mineral Prods. Co.*, 927 A.2d 717 (Pa.Cmwlth.2007),

## II. Statute of Limitations

 The City argues the trial court erred in finding the Property Owners' suit was timely filed. Citing *Wachovia v. Ferretti*, 935 A.2d 565 (Pa.Super.2007), the City argues the statute of limitations began running in 1989, before the close of the *de facto* taking litigation, when the Property Owners' right to institute and maintain a cause of action for payment of just compensation first accrued. Therefore, the current contract litigation is time-barred. The City contends by 1989 the Property Owners knew the following: (1) a *de facto* taking was conclusively established, (2) RANC appraised the property in the amount of $160,000, and (3) RANC did not have sufficient funds to pay the appraisal amount. Therefore, the Property Owners should have filed a claim against RANC and the City for payment of just compensation in 1989. Instead, the Property Owners allowed their claim against the City to expire by waiting for a final judgment and determination of *de facto* taking damages against RANC.

 Most breach of contract actions are governed by a four-year statute of limitations. Section 5525 of the Judicial Code, 42 Pa. C.S. § 5525.[4] Generally speaking, the statute of limitations begins to run as soon as the right to institute and maintain the suit arises. *Sevast v. Kakouras*, 591 Pa. 44, 915 A.2d 1147 (2007). In an action for breach of contract, the statute begins to run on the date the action accrues—the date of the breach. *Packer Soc. Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Med. Ctr.*, 430 Pa.Super. 625, 635 A.2d 649 (1993). The breach occurs when payment under the contract is demanded and not made. *Id.* The City argues that because the Property Owners knew of the Closeout Agreement and were aware of the likelihood RANC would be unable to satisfy the judgment, their claim against the City accrued when the *de facto* taking judgment was finalized.

The City argues the Superior Court's holding in *Wachovia* stands for the proposition that the Property Owners' claim accrued on the date they had notice of the fact of harm, not the specific damage amount. In *Wachovia*, the Superior Court held a legal malpractice claim accrues at the occurrence of an attorney's breach of duty, not when damages were finalized resulting in actual loss. There, the Superior Court reasoned,

> [I]n Pennsylvania, the occurrence rule (i.e., the occurrence of the breach of a duty) governs when the statute of limitations begins to run in a legal malpractice action, and the statute of limitations is tolled only until the injured party should reasonably have learned of this breach. Accordingly, we reject[ ] the plaintiff's argument that the pendency or potential pendency of an appeal in the underlying

*aff'd*, 598 Pa. 331, 956 A.2d 967 (2008). On the first basis, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in movant's favor. *Id.* On the second basis, the court reviews the evidentiary record and concludes the evidence is such that a verdict for the movant is beyond peradventure. *Id.* Judgment notwithstanding the verdict should not be entered where the evidence is conflicting on a material fact, and a reviewing court is required to consider the evidence, together with all reasonable inferences, in a light most favorable to the verdict winner. *Id.*

4. Arguably, the Closeout Agreement is a contract for surety or guarantee, which is governed by a six-year statute of limitations. 42 Pa.C.S. § 5527; *Leedom v. Spano*, 436 Pa.Super. 18, 647 A.2d 221 (1994). The period for bringing the action begins to run within a reasonable time after material default on the underlying obligation. *Id.* However, no party raised this issue.

case would toll the statute of limitations in the legal malpractice action.

*Id.* at 574 (citations and internal quotation marks omitted). Based on this holding, the City argues, the Property Owners allowed the statute of limitations to expire by waiting for a final determination of damages against RANC before seeking payment from the City. We disagree.

The current breach of contract action deals with payment of money by the City for liabilities under the former Eminent Domain Code incurred by another entity, RANC. Thus, unlike the situation in *Wachovia,* the predicate liability does not arise from a common law cause of action; rather, the predicate liability is statutory and is based on a constitutional limitation of government,[5] the procedures are strictly governed by statute, and statutory damages are the measure of loss. In the case of a *de facto* taking, those damages include attorney's fees and reimbursement for costs and expenses of litigation through trial.[6] Also, delay compensation up to the date of payment of the award is recoverable.[7] These damages can only be ascertained at the end of the eminent domain proceedings, here not earlier than September, 1997. Under these circumstances, the common law principles of *Wachovia* are inapplicable. Further, no error is evident in a determination that a 1998 breach of contract suit initiated to compel payment of statutory damages fixed no earlier than 1997 is timely.

Moreover, under the terms of the Closeout Agreement, the City was required to pay eminent domain liabilities of RANC. A breach occurs when the City refuses to honor that contractual obligation. This is the initial point at which Property Owners could maintain an action against the City under the Closeout Agreement. Here, the party asserting the affirmative defense of the statute of limitations, the City, failed to prove that its refusal to honor a demand for payment under the Closeout Agreement occurred more than four years before the 1998 commencement of suit. For this additional reason we discern no legal or factual basis to afford the City relief from the verdict against it on the statute of limitations issue.

### III. Enforceability of Closeout Agreement

The City next maintains that Property Owners could not pursue a breach of contract action because the Closeout Agreement lacks the City Controller's signature as required by law. Section 413(c) of the Optional Third Class City Charter Law[8] provides, "[a]ll bonds, notes, contracts and written obligations of the [C]ity shall be executed on its behalf by the mayor and the controller." Here, the Closeout Agreement was signed by the Mayor but not by the City Controller. The City argues this defect renders the agreement unenforceable.

---

**5.** Article I, Section 10 of the Pennsylvania Constitution states in pertinent part: "[N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."

**6.** Prior to 2006, damages special to *de facto* takings were set forth in Section 609 of the former Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as amended, formerly* 26 P.S. § 1–609, repealed by Section

5 of the Act of May 4, 2006, P.L. 112 (former Eminent Domain Code). That provision is now codified at 26 Pa.C.S. § 709. Other than reformatting, the provision remains identical.

**7.** Section 611 of the former Eminent Domain Code, *formerly* 26 P.S. § 1–611. Similar language is now codified at 26 Pa.C.S. § 713.

**8.** Act of July 15, 1957, P.L. 901, *as amended,* 53 P.S. § 41413(c).

The City further asserts our case law demands strict compliance with formal statutory requirements when a municipality enters a contract. If the formal requirements are not followed, the contract is beyond the scope of the municipal power and therefore void. The City further contends theories of quasi-contract, estoppel, ratification and other equitable doctrines are inapplicable when the law prescribes the methods of municipal contract-formation.

The Property Owners acknowledge the absence of the City Controller's signature but argue, "[t]he City's performance under the terms of the [Closeout Agreement] and its funding of the agreed upon [r]edevelopment activities demonstrate that the City has ratified the contract." Appellee's Br. at 21. Viewing the evidence in a light most favorable to the verdict winner, we conclude the City ratified the Closeout Agreement through nonaction and the acceptance of direct benefits from the Agreement.

 If a statute provides a method of making municipal contracts, this method is mandatory, and where the method is not followed the resulting contract is unenforceable. *Burke v. N. Huntingdon Twp. Municip. Auth.*, 390 Pa. 588, 136 A.2d 310 (1957). Also, a municipality "cannot be bound by the acts of its agents and employees if those acts are outside the agent's powers, in violation of positive law, or acts which require legislative or executive action." *Kellams v. Pub. Sch. Employes' Ret. Bd.*, 486 Pa. 95, 100, 403 A.2d 1315, 1318 (1979).

 However, "[i]t is well settled that contracts which are within the scope of the corporate powers but not authorized by proper action of the municipal corporation ... may be ratified by the proper corporate authorities." *Eckert v. Pierotti*, 123 Pa.Cmwlth. 8, 553 A.2d 114, 118 (1989).

This ratification "may be made by the affirmative action of the proper officials, or by any action or ***nonaction which in the circumstances amounts to an approval of the contract.***" *Id.* at 118 (quoting 10 McQuillin, *Municipal Corporations* § 29.104 (3rd ed. 1982)) (emphasis added). *Accord Chainey v. Street*, 523 F.3d 200 (3d Cir.2008); *Cradle of Liberty Council, Inc. v. City of Phila.*, No. 08–2429, 2008 WL 4399025 (E.D.Pa. Sept. 25, 2008); *Punxsutawney Mun. Airport Auth. v. Lellock*, 745 A.2d 666 (Pa.Super.2000); *City of Scranton v. Heffler, Radetich & Saitta, LLP*, 871 A.2d 875 (Pa.Cmwlth.2005); *Pittsburgh Baseball, Inc. v. Stadium Auth. of the City of Pittsburgh*, 157 Pa.Cmwlth. 478, 630 A.2d 505 (1993). The question before us is, whether, under the circumstances, the City's nonaction amounted to a ratification of the Closeout Agreement.

 Initially, we note that the Closeout Agreement did not lack the required executive and legislative action. In *Moore v. Reed*, 126 Pa.Cmwlth. 283, 559 A.2d 602 (1989), this Court found a municipal contract unenforceable when it was entered into by the Mayor alone, with no action by the City Council. We concluded that although the Mayor exercises the city's executive power, its legislative power rests in the city council that retains "[t]he authority to negotiate a valid and binding contract for a municipality ...." *Id.* at 603. Here, the record shows the Closeout Agreement was considered and endorsed by both the Mayor and City Council. *See* R.R. at 1006a (resolving to approve the Closeout Agreement). Significantly, City Council expressly accepted the City's responsibility to satisfy potential shortfalls in RANC's funds. *See* R.R. at 1090a (City Council Minutes of September 21, 1977). The only defect in the Closeout Agreement's execution was the omission of the

City Controller's signature.[9] Thus, the Closeout Agreement was not illegal and void from the inception, but merely irregularly executed and thereby subject to possible ratification by the City.[10]

In *Pittsburgh Baseball,* we noted the cases supporting ratification by municipal inaction, "appear to have a common denominator; namely, that municipal inaction *plus* the acceptance of benefits under the contract may constitute ratification." *Id.* at 509 (emphasis in original). Likewise, in *Punxsutawney Municipal Airport Authority,* the Superior Court recognized "that municipal inaction, plus the acceptance of benefits may constitute ratification...." *Id.* at 672. Thus, we must determine whether the City accepted benefits from the Closeout Agreement.

In *Pittsburgh Baseball,* we concluded the city's receipt of indirect benefits to be insufficient to support ratification by nonaction. There, the plaintiff sought enforcement of an oral promise by the city's mayor to provide significant financial assistance in exchange for plaintiff's agreement to purchase the Pittsburgh Pirates baseball team. The plaintiff argued the city received benefits from the agreement in the form of taxes on ticket sales and fan spending on local goods and services. We concluded this did not constitute a direct benefit because, "[c]learly, it is the Pirates' fans, and not [the plaintiff], that pay the taxes on ticket sales and make the other expenditures." *Id.* at 510. Accordingly, we determined there could be no ratification by nonaction where the city received only an indirect benefit from the disputed agreement.

Here, unlike in *Pittsburgh Baseball,* the City received a significant, direct benefit from the Closeout Agreement: HUD redirected substantial funding for the Urban Renewal Project to the City. This funding, unlike the revenue collected from third parties in *Pittsburgh Baseball,* constituted a direct benefit to the City.

Additional significant circumstances support our conclusion that the City ratified the Closeout Agreement. At the time of the Agreement's execution, it was the City's and its Controller's practice to enter into all contractual agreements without the Controller's signature. *See* R.R. at 1265a–75a. These contracts included, among others, collective bargaining agreements, lease agreements, and automobile pur-

9. "[C]ity controllers of third class cities have discretion not to sign *only* where the violation of law is clear and well known, or where there is fraud or bad faith present." *Smithgall v. Campbell,* 885 A.2d 669, 672 (Pa. Cmwlth.2005) (emphasis added). Here, the City does not allege the presence of such conditions.

10. As an alternative rationale supporting the trial court's action, the Closeout Agreement could be implied in law by the doctrine of quasi-contract. "Quasi-contracts are contracts which are implied in law for reasons of justice." *Pittsburgh Baseball, Inc. v. Stadium Auth. of City of Pittsburgh,* 157 Pa.Cmwlth. 478, 630 A.2d 505, 510 (1993). To avoid obvious injustice, quasi-contract applies "where a municipality ... has voluntarily accepted and retained the benefits of a contract which it had the power to make but which was defective in the method of its execution and consequently invalid...." *Id.* (quotations omitted).

The record here demonstrates the applicability of quasi-contract. First, it is clearly within the City's power to enter into contracts and written obligations such as the Closeout Agreement. Second, the City repeatedly accepted HUD funds for its Urban Renewal Project without objection from any City officials, including the City Controller. Third, it is unjust to allow the City, over the course of several years, to enjoy the benefits of the Closeout Agreement, only then to claim the agreement is unenforceable, thereby denying Property Owners a remedy for their loss. Therefore, the Closeout Agreement can be implied in law.

chases, including a purchase contract valued at $579,456.30. R.R. at 1265a–75a, 1269a. This evidence, viewed in a light most favorable to the verdict winners and affording them all favorable inferences, establish the City Controller consistently endorsed municipal contracts by nonaction.

In short, we conclude the Closeout Agreement is enforceable against the City despite the lack of the City Controller's signature because the City ratified the Agreement through nonaction coupled with the acceptance of substantial direct benefits. Because we conclude Property Owners' suit was timely filed and the Closeout Agreement enforceable, we decline to grant relief from the non-jury verdicts, and we affirm the trial court.

### ORDER

AND NOW, this 14th day of May, 2009, the order of the Court of Common Pleas of Lawrence County is **AFFIRMED.**

### DISSENTING OPINION BY Judge PELLEGRINI.

What is involved in this interlocutory appeal is whether holders (collectively, Property Owners) of a judgment of $1,715,621.18 against the Urban Redevelopment Authority of the City of New Castle (Authority) for a *de facto* taking of their property can bring a third-party beneficiary action[1] against the City of New Castle (City) under a "contract" (Close Out Agreement) providing that it would reimburse the Authority for such takings.[2] The City contends that Property Owners cannot bring a third-party beneficiary action because there is no "contract" to be a beneficiary because the Close Out Agreement did not contain the statutorily required signature of the elected City Controller.

The majority finds that the City Controller's "inaction" in not signing the contract allows the legislative mandate to be ignored. While in limited instances, we have stated in *dicta* that inaction may be tantamount to excuse compliance with the statute, nothing in our case law suggests that ratifications can occur absent a showing that the required elected official knew of the contract, but allowed it to proceed without objection. Because there has been no showing that the City Controller ever knew of this contract or any other contract that was unsigned, and because a quasi-contract claim cannot be maintained in a third-party beneficiary action, even among private parties, I respectfully dissent.

The City is an optional Third Class City. The signature of its Controller is required by Section 413 of the Optional Third Class City Charter Law,[3] which provides: "All bonds, notes, contracts and written obligations of the city shall be executed on its behalf by the mayor and the controller."

---

1. A third-party beneficiary of a contract may arise no higher than the rights of the promisor to the contract. *Zimnisky v. Zimnisky,* 210 Pa.Super. 266, 231 A.2d 904 (1967). *See also Johnson v. Pennsylvania National Insurance Companies,* 527 Pa. 504, 594 A.2d 296 (1991); *General Accident Insurance Company of America v. Parker,* 445 Pa.Super. 300, 665 A.2d 502 (1995). A third-party beneficiary is subject to the same limitations that may be asserted between the promisor and promisee. *Id.See also* Restatement 2nd Contracts § 302.

2. Because this is an interlocutory appeal and the issues certified are limited, not before us is whether a private party can be the beneficiary of a contract between two governmental agencies.

3. Act of July 15, 1957, P.L. 901, *as amended,* 53 P.S. 41413(c).

When a statute requires that certain officials execute a contract, "It has been uniformly held, and may now be regarded as the general rule in this state, that, where a statute provides a method or formal mode of making municipal contracts, such provision is mandatory and must be observed, otherwise the contract is not enforceable against the municipality...." *Harris v. City of Philadelphia*, 283 Pa. 496, 503, 129 A. 460, 462 (1925); *Burke v. North Huntingdon Twp. Municipal Authority*, 390 Pa. 588, 594, 136 A.2d 310, 313–314 (1957). Moreover, parties contracting with a governmental agency must, at their peril, know the statutory requirements for a governmental agency to enter into a contract. *Central Storage & Transfer Co. v. Kaplan*, 487 Pa. 485, 489, 410 A.2d 292, 294 (1979); *Commonwealth v. Seagram Distillers Corporation*, 379 Pa. 411, 109 A.2d 184 (1954).

However, the prescription against the enforceability of contracts that are not executed by the required elected officials mandated by statute are not without exception. In *Eckert v. Pierotti*,[4] 123 Pa. Cmwlth. 8, 553 A.2d 114, 119 (1989), we stated:

> It is well settled that a municipal corporation may ratify contracts which are within its corporate powers and made by its officers without authority, or in excess of their authority. In other words, the municipal corporation may waive the irregularity of a municipal contract and ratify that contract.

It is a general rule that whatever acts *public officials* may do or authorize to be done in the first instance may subsequently be adopted or ratified by them with the same effect as though properly done under previous authority. [Footnote omitted.] Consequently, it is well settled that contracts which are within the scope of the corporate powers but not authorized by proper action of the municipal corporation, that is, contracts not ultra vires, may be ratified by the proper corporate authorities. 10 McQuillen § 29.104 (3rd ed.). Moreover, "[t]he ratification of a contract by the municipal corporation may be made by the affirmative action of the proper officials, or by any action or nonaction which in the circumstances amounts to an approval of the contract." [McQuillen (3rd ed.)] at § 29.106 (footnotes omitted).

"In other words, the municipality may waive an irregularity of a municipal contract and ratify that contract. This ratification may be made by the affirmative action of the proper officials or by any action or inaction which, under the circumstances, amounts to an approval of the contract." *City of Scranton v. Heffler, Radetich & Saitta, LLP*, 871 A.2d 875 (Pa.Cmwlth.2005), *petition for allowance of appeal denied*, 587 Pa. 708, 897 A.2d 1184 (2006). The question here is whether the Close Out Agreement was ratified to

4. *Eckert* does not involve an implied ratification, but an express ratification. In that case, an engineering firm was accepted as the contractor for a sewage project; however, there was no indication of a formal vote or resolution to that effect. Approximately six months later, the township supervisor entered into an agreement for engineering services, which was challenged as not being properly authorized. Over a year later, the township formally approved the agreement by motion. We found that because the township had the power to enter into the contract and also had the power to ratify it, the agreement was to be given its full effect. Thus, despite the fact that the township supervisor unilaterally entered into an agreement, this act without the proper authority was later rectified because the township later formally approved and ratified the agreement to use the engineering firm, which was under the proper authority.

**1058**

"excuse" non-compliance with the statutory mandate.[5]

*City of Scranton* is controlling. We held that the knowledge of the City Controller was required before inaction could be used as a method to ignore the statutory mandates. In that case, the former mayor signed an agreement with a corporation for professional services in the nature of analysis and auditing of insurance claims, which also contained a provision requiring the parties to attend binding arbitration in lieu of any other legal remedy. Within one year, the former-mayor's administration was replaced by that of the newly-elected mayor. Representatives from the company eventually filed a demand for arbitration after the administration of the newly-elected mayor allegedly failed to return phone calls and maintain correspondence. The city filed a petition for rule to

**5.** In making its analysis, the majority relied mainly on our decision in *Pittsburgh Baseball, Inc. v. Stadium Authority of Pittsburgh*, 157 Pa.Cmwlth. 478, 630 A.2d 505 (1993). While not contrary to my analysis because it also holds that knowledge of the particular official whose assent is required before there can be ratification by inaction, I need to comment because the majority opinion may give a false impression of its holding. In that case, the mayor of the City of Pittsburgh purportedly promised that the City would unconditionally provide Pittsburgh Baseball Associates with additional capital of $5,000,000. It also alleged that the city council knew about the offer and did nothing; it ratified the oral promise of the mayor. The majority cited the holding in *Pittsburgh Baseball Associates* as follows: "In Pittsburgh Baseball, we noted that the cases supporting ratification by municipal inaction plus the acceptance of benefits under *the contract may constitute ratification.*" *Id.* at 509. (Emphasis in original.) However, the full quote from *Pittsburgh Baseball Associates* is as follows:

Pittsburgh Associates cites a single Pennsylvania case, *Eckert v. Pierotti*, 123 Pa.Commonwealth Ct. 8, 553 A.2d 114 (1989), for the proposition that a municipality can ratify an irregular contract by inaction. In that case, we quoted extensively from **10A Eugene McQuillen, The Law of Municipal Corporations §§ 29.104–29.106 (3rd ed.),** including the following: " '[t]he ratification of a contract by the municipal corporation may be made by the affirmative action of the proper officials, or by any action or nonaction which in the circumstances amounts to an approval of the contract.' Id., § 29.106 (footnotes omitted)." *Eckert*, 123 Pa.Commonwealth Ct. at 18, 553 A.2d at 118 (emphasis added).

Since the township in Eckert formally approved and ratified the contract at issue in that case, we do not find that case to be persuasive. With respect to the numerous cases Pittsburgh Associates has cited from other jurisdictions, we note that most, if not all, of those cases appear to have a common denominator; namely, that municipal inaction plus the acceptance of benefits under the contract may constitute ratification. Since we conclude later in this opinion that actions by Pittsburgh Associates did not confer any direct benefits on the City, we are not persuaded by those cases from other jurisdictions. **In any event, we conclude that on the facts pleaded, City Council's failure to take action does not constitute "nonaction which in the circumstances amounts to an approval of the contract."** As such, the trial court did not err in dismissing the breach of contract count. (Emphasis added.)

As can be seen in the full quote of the language relied on by the majority, it addresses the law in other states, not the law in Pennsylvania. In addition, the other cases that have used this language, *Eckert* and *City of Scranton*, express ratification was required to appear. Nowhere have we ever held, even when the official knew of the contract, that mere inaction constitutes ratification, but instead have required affirmative action. It also illustrates how the McQuillen language regarding ratification by inaction seeped into Pennsylvania jurisprudence without discussion.

While not altogether clear, it appears that in *Pittsburgh Baseball*, we held that a legislative body cannot be held to have ratified a contract just by inaction. If that were not so, the General Assembly would spend all of its time passing legislation repudiating promises made by the Governor to fund "this and that" until it passed the appropriate legislation.

show cause alleging that the agreement signed by the former mayor was invalid and unenforceable for failure to be approved in accordance with provisions of the city's administrative code which required that all professional service contracts be approved by city council, reviewed and approved by the city solicitor and signed by the mayor, controller and attested to by the city clerk. The city also alleged that with the exception of the mayor's signature, no other procedural requirements were met, which made the agreement invalid and unenforceable. The corporation alleged that the agreement was subsequently approved, ratified and endorsed by all required city officials, agents and representatives. Citing to *Eckert*, we noted in that decision that this Court addressed ratification, stating that a municipal corporation could ratify contracts within its corporate powers and made by its officers without its authority or in excess of their authority, and "this ratification may be made by the affirmative action of the proper officials or by any action or inaction which, under the circumstances, amounts to an approval of the contract." *Id.* at 881. (Internal citations omitted.) Based on these principles, we found that the evidence of record failed to reveal that the city council was "even aware of the agreement, let alone that they had approved of and enacted appropriate legislation rela-

tive to this agreement." *Id.* at 881. We also held that there was no post-contract ratification as the evidence of record failed to reveal the knowledge of the city controller whose signature was required along with the mayor under the provision of the city's administrative code. In sum, we found that every official or entity that was required to sign the contract was required to have ratified the contract by taking actions that evidence their implicit assent.

Similarly to the *City of Scranton*, the Close Out Agreement was not signed by the City Controller as required by Section 413 of the Optional Third Class City Law. In order for Property Owners to make out their case of ratification, they must show that the City Controller ratified the Close Out Agreement, either explicitly or by his actions. Property Owners presented evidence consisting of a summary of contracts between the years 1972 through 1977 requiring the City to advance funds to the Redevelopment Authority under the Close Out Agreement, none of which contained the City Controller's signature.[6] (Reproduced Record at 1265a–1275a.) Because there is no evidence to establish that the City Controller ever signed the Close Out Agreement or even acknowledged the Close Out Agreement, ratification of the original agreement by the City Controller has not been made out.[7]

---

6. The City Controller does not sign checks. Section 415(a) on the Optional Third Class City Law, 53 P.S. § 41415(a), provides that: (a) The city treasurer shall perform such functions and duties and have such powers relating to the collection, receiving, safekeeping and payment over of public moneys including city, county, institution district and school district taxes as provided by general law and shall have such other functions, powers and duties as may be assigned to him by council. Article 127, Section 127.05 of the New Castle Code of Ordinances provides that, "All expenditures made by the City shall be made by checks signed by the City Treasurer . . ."

7. The majority cites to a chart contained in the Reproduced Record at 1265–75a to state at the time of the execution of the Close Out Agreement, it was the City's practice to enter into a contractual agreement without the Controller's consent. Property Owners' brief states that this chart was prepared from documents received regarding specific contracts that went before Council for authorization. Ignoring that I cannot find where this chart was admitted into the record, all that can be discerned from the chart is that during the five year period from 1972 to 1977, there were 54 agreements where one party signed the contract but the Controller did not.

The majority also proposes as an alternative rationale that "the Close Out Agreement could be implied in law by the doctrine of quasi-contract." In *Pittsburgh Baseball, Inc. v. Stadium Authority*, 157 Pa.Cmwlth. 478, 630 A.2d 505, 510 (1993), we explained that:

> Quasi-contracts are contracts which are implied in law for reasons of justice. *Department of Public Welfare v. Moran*, 84 Pa.Commonwealth Ct. 554, 480 A.2d 356 (1984). In *J.A. & W.A. Hess, Inc. v. Hazle Township*, 484 Pa. 628, 633, 400 A.2d 1277, 1279 (1979), our supreme court, quoting *Luzerne Township v. Fayette County*, 330 Pa. 247, 199 A. 327 (1938), stated:
>
> > [i]t is true that, in order to avoid results involving obvious injustice, the courts of some jurisdictions, including our own, have held that where a municipality or other local agency of government has voluntarily accepted and retained the benefits of a contract which it had the power to make but which was defective in the method of its execution and consequently **invalid, the party who, by furnishing labor or material, has conferred such benefits may recover compensation therefore in a suit, not on the invalid contract itself, but upon a quantum valebat, quantum meruit, or for money had and received** ... (Emphasis added.)

A quasi-contract claim then is separate and apart from the claim based on the invalid contract, i.e., the Close Out Agreement could not be implied as the majority suggests. Because it is a separate and distinct claim with a different and distinct calculation of damages, a separate claim would to have to be made in the complaint. In this case, Property Owners only pled a third-party beneficiary claim under the Close Out Agreement and never made a quasi-contract claim. Ignoring that, the amount the Authority would be entitled from the City under a quasi-contract claim would be the same as the Authority would be entitled to under the Close Out Agreement, i.e., the judgment amount. All that it would be entitled to is the amount of tangible benefit that the Authority conferred on the City for taking property that the Authority did not intend to take. Complicating this discussion even more is the entire issue of whether a third-party beneficiary claim can be raised in a quasi-contract action. Maybe those are the reasons that Property Owners did not raise that claim in their complaint.

Having said all that, I realize that the result I propose is harsh. But it is also harsh when a person is paralyzed by governmental negligence and cannot recover damages because the government's conduct does not fall into one of the exceptions to immunity. Article I, Section 2 of the Pennsylvania Constitution; 42 Pa.C.S. § 8522(b); 42 Pa.C.S. § 8542(b). And it is harsh when ordinances are passed and approvals given allowing a property owner to engage in a major development on which he expends millions of dollars that are vitiated because the municipality inadvertently did not comply with the statutory procedures. *Luke v. Cataldi*, 593 Pa. 461,

There were also 41 authorizations where council authorized a contract to be entered but no one signed. I doubt this was a complete list of all the contracts that the City entered over the period—probably hundreds more—because there were no contracts listed for the types of professional services and goods and supplies that were entered into every day to run a municipality. Moreover, there was no showing whether because they remained unexecuted, they were abandoned, because no one or just the Controller failed to sign them. In any event, it does not show that the Controller had knowledge of those contracts.

932 A.2d 45 (2007); *Glen–Gery Corp. v. Zoning Hearing Bd. of Dover Twp.,* 589 Pa. 135, 153, 907 A.2d 1033, 1043 (2006). While the result is similarly harsh in this case, public policy embodied in the Constitution and statutes sometimes require harsh results on individuals for the greater good. In this case, the General Assembly mandated that the elected controller sign all contracts entered into by the City. We should not look for ways to sanction avoidance of those statutorily required procedures by further expanding exception to allow a government contract to be ratified, even when there is no showing that the elected official was aware of the contract. By doing so, the majority subverts the legislative mandate.

Accordingly, because the City Controller as mandated by Section 413 of the Optional Third Class City Charter Law did not sign the contract, and there is no evidence that he or she subsequently ratified the Close Out Agreement, I would reverse the order of the trial court.