### ORDER

**AND NOW,** this 11th day of July, 2013, the order of the Court of Common Pleas of Pike County is **AFFIRMED.**

Robert W. McGAFFIC, Executor of the Estate of Eleanor L. McGaffic, Deceased; Robert W. McGaffic, in his own right; and George G. Love, Appellants

v.

CITY OF NEW CASTLE.

Commonwealth Court of Pennsylvania.

Argued Nov. 14, 2012.

Decided July 22, 2013.

George Love (collectively, Condemnees) appeal an order of the Court of Common Pleas of Lawrence County (trial court) that denied Condemnees' contract claim against the City of New Castle. Condemnees are the prior owners of the Centennial Building, a commercial building in downtown New Castle, Pennsylvania, which lost its value in the course of New Castle's urban renewal program. Accordingly, Condemnees successfully obtained a judgment against the Redevelopment Authority of New Castle for a *de facto* condemnation of their property. The Redevelopment Authority cannot pay the judgment, and Condemnees seek to hold the City responsible for its payment under a contract between the City and the Redevelopment Authority by which the City assumed financial responsibility for certain claims against the Redevelopment Authority. Condemnees argue that their *de facto* condemnation judgment is one of those claims. We agree and reverse the contrary construction of the contract reached by the trial court.

## Background

In 1966, the Redevelopment Authority developed a plan for the redevelopment of downtown New Castle, known as the Central Area Urban Renewal Project. This plan called for, *inter alia*, the Redevelopment Authority's acquisition and demolition of the Centennial Building. In November 1968, the Redevelopment Authority filed this plan with the Lawrence County Recorder of Deeds. The Redevelopment Authority applied for and received funding for the project from the United States Department of Housing and Urban Development (HUD) under the Neighborhood Development Program.

Jonathan Solomon, New Castle, for appellants.

Samuel P. Kamin, Pittsburgh, for appellee.

BEFORE: PELLEGRINI, President Judge, and LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, LEAVITT, Judge, McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge LEAVITT.[1]

Robert McGaffic (as executor of his mother's estate and in his own right) and

---

1. This case was reassigned to the opinion writer on May 14, 2013.

In accordance with the recorded plan, the Redevelopment Authority notified existing and potential tenants of the Centennial Building that the building was expected to be demolished in 1970 and that the Authority would pay for only one move by a tenant. By April 12, 1973, when the Redevelopment Authority contracted with a developer to rebuild downtown New Castle, including a replacement for the Centennial Building, Condemnees did not have rental income sufficient to pay taxes, insurance or utilities; the Centennial Building was rendered useless. *McGaffic v. Redevelopment Authority of the City of New Castle* (Law. Cnty. Ct. of C.P., No. 160–1978 M.D., filed October 8, 1986), slip op. at 21, *aff'd, McGaffic v. Redevelopment Authority of the City of New Castle,* 120 Pa.Cmwlth. 199, 548 A.2d 653 (1988).

In July of 1977, the City and the Redevelopment Authority executed a so-called Closeout Agreement to transfer responsibility for the Central Area Urban Renewal Project from the Authority to the City, as required by HUD.[2] As part of that transfer, the City assumed broad financial responsibility for the Redevelopment Authority's actions. Paragraph 4 of the Closeout Agreement states:

> *Any costs or obligations* incurred in connection with the said [renewal] program *with respect to claims which are disputed, contingent, unliquidated or unidentified,* and for the payment of which insufficient program funds have been reserved, as set forth in the next above paragraph, *shall be borne by the [City].*

Reproduced Record at 1014 (R.R.____) (emphasis added).[3] The City's assumption of this responsibility was required as a condition of HUD's continuing financial support for the urban renewal of New Castle. In 1978, the Centennial Building was officially removed from the renewal plan, and shortly thereafter Condemnees filed a *de facto* condemnation action against the City and the Redevelopment Authority. The City's application to be removed as a defendant was granted in 1980.

Condemnees' suit instituted decades of litigation, which has involved four prior appeals to this Court by the Redevelopment Authority and by the City. In each

---

**2.** Congress decided to phase out HUD's Neighborhood Development Program and replace it with the Community Development Block Grant Program. The Neighborhood Development Program provided funding directly to redevelopment authorities, and the Community Development Block Grant Program provided funding to municipalities. Plans started under the Neighborhood Development Program had to be completed before new plans could be developed. However, municipalities had to assume responsibility for the plans of redevelopment authorities undertaken under the Neighborhood Development Program, such as the Central Area Urban Renewal Project.

**3.** The "next above paragraph," Paragraph 3 of the Closeout Agreement, states:
The [Redevelopment Authority] from proceeds available upon financial settlement of the said [renewal] program and from proceeds received as set forth in the next above paragraph shall liquidate all outstanding obligations, commitments and costs of the category set forth in Exhibit "B" attached hereto and incorporated herein by this reference, to the extent possible. *In the event said funds and proceeds are inadequate to fully satisfy all such obligations, commitments and costs in completing said activities, the [City] hereby agrees to fully and completely liquidate any deficiency that may be created by the completion thereof.*
R.R. 1014 (emphasis added). Paragraph 3 of the Closeout Agreement reveals the City's obligation to indemnify the Redevelopment Authority for all costs in completing Exhibit "B." As discussed below, Exhibit "B" is an approved and submitted budget, which covers future acquisitions.

appeal the Condemnees have prevailed.[4] It has been definitively established, in fact and in law, that the Redevelopment Authority's actions destroyed the value of the Centennial Building as of April 12, 1973. In 1994, a board of viewers valued the Centennial Building at $184,000 as of April 12, 1973, and that award has been augmented by delay damages. *McGaffic*, 732 A.2d 663. In June 2008, the judgment was revived for a total amount of $2,035,210.53.

In February 1998, Condemnees filed the instant contract claim seeking payment of their *de facto* condemnation judgment from the City under Paragraph 4 of the Closeout Agreement. The City sought summary judgment on the theory that Condemnees' action was barred by the City's governmental immunity and by the statute of limitations. The City lost.

*McGaffic*, 973 A.2d 1047. Condemnees' contract claim then went to trial on the merits. The City defended on two theories. First, the City contended that Condemnees were not third-party beneficiaries of the Closeout Agreement and, thus, lacked standing to enforce the City's promise in Paragraph 4. Second, the City contended that Condemnees' action was untimely under the doctrine of laches.

At trial, the City presented testimony from Edward Gamble, the attorney for the Redevelopment Authority, and Richard Flannery, a member of City Council. They testified that the Closeout Agreement was not intended to benefit the owners of the Centennial Building. Gamble testified that Exhibit A of the Closeout Agreement listed all the properties that

---

4. In the first appeal, this Court affirmed the trial court's denial of the Redevelopment Authority's preliminary objections. *McGaffic v. Redevelopment Authority of the City of New Castle*, 120 Pa.Cmwlth. 199, 548 A.2d 653 (1988). The trial court found, as fact, that it was not the economy or poor management that caused the steady decline in the number of tenants in the Centennial Building but, rather, the actions of the Redevelopment Authority. The Authority's notice to tenants, *inter alia*, that the Centennial Building was slated for demolition and that the Authority would pay only for one move made it impossible to keep existing tenants or to attract new ones. By 1973, rental income was inadequate to pay maintenance, utilities, taxes or insurance.

In the second appeal, this Court affirmed the damages fixed by a board of viewers for the *de facto* condemnation of the Centennial Building. *Redevelopment Authority of the City of New Castle v. McGaffic*, 677 A.2d 1333 (Pa.Cmwlth., No. 1273 C.D.1995, filed June 10, 1996). The Board determined that the value of the property taken on April 12, 1973, was $184,000. *Id.*, slip op. at 5. The Board began with a 1970 appraisal of $160,000, which it adjusted to $184,000 to account for inflation and an increase in the building's value because of an increased demand for rental space in the area. The Board also determined that delay damages should be calculated from the date of the taking, *i.e.*, April 12, 1973.

In the third appeal, this Court affirmed the trial court's award of delay damages for the Redevelopment Authority's *de facto* condemnation of the Centennial Building, with one small exception. *McGaffic v. Redevelopment Authority of the City of New Castle*, 732 A.2d 663, 667–68 (Pa.Cmwlth.1999). The trial court awarded $230,000 as general damages for the fair market value of the property taken on April 12, 1973, and delay compensation of $949,386.43. The delay compensation included special damages for taxes, utilities and litigation costs. The award was adjusted by a 1995 payment by the Authority to Condemnees in the amount of $106,666.66 by which the Redevelopment Authority took ownership of the Centennial Building. This Court remanded for a recalculation of interest.

In the fourth appeal, this Court affirmed the trial court's decision that Condemnees were not barred by the statute of limitations or the doctrine of governmental immunity from seeking payment from the City of the *de facto* condemnation award against the Redevelopment Authority under authority of Paragraph 4 of the Closeout Agreement. *McGaffic v. City of New Castle*, 973 A.2d 1047 (Pa.Cmwlth.2009).

were going to be acquired under the 1968 renewal plan.[5] The Centennial Building was not on that list.

However, other evidence presented at trial established that the Redevelopment Authority acquired properties not listed on Exhibit A. The Redevelopment Authority acquired the Clara Thomas property by *de facto* condemnation on September 8, 1977, after the Closeout Agreement was executed. The Redevelopment Authority acquired the David McBride property in June of 1978, one year after the Closeout Agreement was executed. In 1995, the Redevelopment Authority acquired the Centennial Building, pursuant to a stipulation, for a payment of $106,666.66. *McGaffic*, 732 A.2d at 667. None of these three properties were listed in Exhibit A.

The trial court concluded that Condemnees were not intended third-party beneficiaries of the Closeout Agreement because Condemnees filed their *de facto* condemnation action after the Closeout Agreement was executed.[6] The trial court credited the testimony of Gamble and Flannery that there was no intention to acquire the Centennial Building when the City and Redevelopment Authority signed the Closeout Agreement.[7] The trial court found it noteworthy that the Centennial Building was not named in Exhibit A, which it construed to contain the universe of properties to be acquired under the renewal plan. In accordance with these conclusions, the trial court entered judgment in favor of the City, and Condemnees appealed to this Court.[8]

## Appeal

In their appeal, Condemnees present two principal issues for our consideration. First, they contend that the trial court erred in holding that Condemnees lacked standing to enforce the Closeout Agreement; this error was based upon the trial court's misunderstanding of the law on third-party beneficiary rights. Second, they contend that the trial court abused its discretion by accepting testimony, not the

5. Gamble gave conflicting testimony about Exhibit A. He stated, first, that Exhibit A listed properties that had already been acquired by the Authority. After Gamble's counsel interrupted his cross-examination, Gamble reversed course, stating that it covered all properties, those not yet acquired and those already acquired. Notes of Testimony, March 10, 2011, at 42–43; R.R. 668–69. The better read is that Exhibit A lists properties that had already been titled in the Authority. However, it does not matter because all agree that the Redevelopment Authority was going to acquire additional properties as it carried out the renewal plan. Exhibit B includes a budget of $268,650 for future acquisitions and does not limit those acquisitions to properties listed on Exhibit A. These other acquisitions took place.

6. Clara Thomas, by contrast, had filed her *de facto* condemnation claim before the Closeout Agreement was signed.

7. We must accept the credibility determinations and factual findings of the trial court that are supported by substantial evidence.

The factual findings of the trial court, particularly with respect to Exhibits A and B, have no legal significance. It does not matter whether the City intended to approve a purchase of the Centennial Building because *de facto* takings are unintentional.

8. This Court reviews the decision of a trial court in a non-jury trial to determine whether the findings are supported by competent evidence and whether the trial court committed an error of law; additionally, findings of a trial judge in a non-jury trial are given the same weight and effect as the verdict of a jury, and they will not be disturbed on appeal absent error of law or abuse of discretion. *Centennial Station Condominium Association v. Schaefer Company Builders, Inc.*, 800 A.2d 379, 382 n. 1 (Pa.Cmwlth.2002). The interpretation of any contract is a question of law, and thus, the standard and scope of review is plenary. *Currid v. Meeting House Restaurant, Inc.*, 869 A.2d 516, 519 (Pa.Super.2005).

actual language of Paragraph 4 of the Closeout Agreement, to reach the conclusion that Condemnees' claim did not fall within the category of "disputed, contingent, unliquidated or unidentified" claims that became the City's responsibility by reason of Paragraph 4. In effect, both issues turn on a single question, *i.e.*, whether Condemnees may enforce the City's promise given in Paragraph 4 of the Closeout Agreement to cover shortfalls in the Redevelopment Authority's funding.

For its part, the City focuses on the fact that the Closeout Agreement does not specifically name Condemnees or the Centennial Building or use the term "third-party beneficiary." The City claims that this type of explicit expression is a necessary precondition to Condemnees' ability to enforce Paragraph 4 because the parties to the Closeout Agreement were government agencies. The City also argues that the Redevelopment Authority breached another related contract, called the Cooperation Agreement, by not obtaining the City's approval of the Redevelopment Authority's *de facto* condemnation of the Centennial Building. Because of this breach, the City cannot be held to its promise to the Redevelopment Authority set forth in Paragraph 4. Alternatively, the City contends that Condemnees' action is untimely.

### Third–Party Beneficiary Law

■ We begin with a review of the law regarding third-party standing in Pennsylvania. The general rule is that a contract must express an intention to confer standing on a third-party beneficiary. *Scarpitti v. Weborg*, 530 Pa. 366, 370, 609 A.2d 147, 149 (1992). In *Marsteller Community Water Authority v. P.J. Lehman Engineers*, 413 Pa.Super. 387, 605 A.2d 413 (1992), for example, it was held that a contract between a redevelopment authority and an engineering firm to upgrade a water system owned by a water authority expressed an intention to make the water authority a third-party beneficiary of the contract.[9]

In *Guy v. Liederbach*, 501 Pa. 47, 59–60, 459 A.2d 744, 751 (1983), our Supreme Court adopted Section 302 of the Restatement (Second) of Contracts (1979), which allows a third-party to enforce a contractual promise even though the contract does not explicitly express that intention. Section 302 states:

Intended and Incidental Beneficiaries

(1) *Unless otherwise agreed between promisor and promisee*, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

> *(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary;* or

9. What constitutes an "express intention" varies. In *Johnson v. Pennsylvania National Insurance Companies*, 527 Pa. 504, 594 A.2d 296 (1991), our Supreme Court held that a taxicab passenger was an intended third-party beneficiary of the taxicab owner's insurance policy and, thus, bound by the policy's requirement to arbitrate a claim for uninsured motorist benefits. *Id.* at 508, 594 A.2d at 298. The taxicab passenger was not named in the policy nor a party to the contract. In *Keefer v. Lombardi*, 376 Pa. 367, 102 A.2d 695 (1954), our Supreme Court found unnamed citizens and property owners to be third-party beneficiaries of a contract between a municipality and a contractor by which the contractor assumed liability for any damages caused by the construction. *Id.* at 369–70, 102 A.2d at 696. The Supreme Court found that "the drafters of the contract ... include[d] as beneficiaries the inhabitants of the city for which they acted." *Id.* at 372, 102 A.2d at 698. An express intention to create third-party beneficiaries does not require, even in the context of a government contract, that the beneficiaries be specifically named.

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

RESTATEMENT (SECOND) OF CONTRACTS § 302 (1979) (emphasis added). Our Supreme Court has explained that under Section 302

a party becomes a third party beneficiary only where ... *the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties,* and the *performance satisfies an obligation of the promisee to pay money* to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance....

*Scarpitti,* 530 Pa. at 372–73, 609 A.2d at 150–51 (emphasis added) (citations omitted). Stated otherwise, the "compelling circumstances," or first prong, "sets forth a standing requirement," and the second prong defines the type of claim to be presented by a third-party beneficiary. *Id.* at 371, 609 A.2d at 150. Notably, the named promisee's inability or lack of incentive to enforce a contractual promise will support the third-party's standing to enforce the promise. *Id.*

■■■ In sum, whether a contract contemplates enforcement by third-parties is a matter of contract construction. Parties may explicitly state that a contract provision is intended to create third-party beneficiary rights and identify, by name, the holder of those rights. Parties may explicitly state that a contract is *not* intended to create third-party beneficiary rights or identify the specific persons who do not hold these rights, as noted in Section 302(1) of the Restatement (Second) of Contracts. Most contracts are not explicit, and in that case the principles set forth in Section 302 are employed to ascertain the intention of the parties.

■■■ The heart of this appeal is whether Condemnees may enforce the City's promise, which is given in Paragraph 4 of the Closeout Agreement, to cover shortfalls in funding needed by the Redevelopment Authority to pay Condemnees' *de facto* condemnation judgment.

### Paragraph 4 of the Closeout Agreement

The contract language determines the existence and scope of third-party beneficiary rights. Paragraph 4 is the critical contract provision in that inquiry, and it states as follows:

*Any costs or obligations* incurred in connection with the said [renewal] program *with respect to claims which are disputed, contingent, unliquidated or unidentified,* and for the payment of which insufficient program funds have been reserved, as set forth in the next above paragraph, *shall be borne by the [City].*

R.R. 1014 (emphasis added). In Paragraph 3, the "next above paragraph," the City agreed "to fully and completely liquidate any deficiency."[10] *Id.* In short, the

---

10. Paragraph 3 of the Closeout Agreement, states:

The [Redevelopment Authority] from proceeds available upon financial settlement of the said [renewal] program and from proceeds received as set forth in the next above paragraph shall liquidate all outstanding obligations, commitments and costs of the category set forth in Exhibit "B" attached hereto and incorporated herein by this reference, to the extent possible. *In the event said funds and proceeds are inadequate to fully satisfy all such obligations, commitments and costs in completing said activities, the [City] hereby agrees to fully and*

City agreed to bear the cost of claims incurred "in connection with the said program" by the Redevelopment Authority that, at the time of the contract's execution, were "unidentified." Condemnees' *de facto* condemnation award against the Authority fits this definition: when the Closeout Agreement was executed, Condemnees' *de facto* condemnation award against the Authority was an "unidentified" "cost or obligation" "incurred in connection with the said program." Because program funds were "insufficient" to pay the award when it became final, Condemnees' condemnation award is a "cost" to be "borne by the City" under Paragraph 4. R.R. 1014.

This straightforward read of Paragraph 4 is consistent with our most recent opinion in this litigation saga, wherein we noted that by this contract provision, the City assumed liability for any eminent domain award resulting from the Redevelopment Authority's actions. We explained as follows:

> [U]nder the terms of the Closeout Agreement, the City was required to pay eminent domain liabilities of [the Authority] ... [and] City Council expressly accepted the City's responsibility to satisfy potential shortfalls in [the Authority's] funds.

*McGaffic v. City of New Castle*, 973 A.2d at 1053–54. Forty years after the Redevelopment Authority effected its *de facto* taking of the Centennial Building in 1973, it has ceased to exist and has no assets to attach. Were it otherwise, the Redevelopment Authority would be making a demand on the City under Paragraph 4 of the Closeout Agreement for the funds needed to satisfy Condemnees' award.

In short, Paragraph 4 states an express intention to provide for the City's payment of claims of third-parties where the Redevelopment Authority lacks the funds to do so. This expressly stated intention satisfies the so-called "general rule."

The City argues that a government contract does not create third-party beneficiary rights unless the contract specifically names that beneficiary. In support, it relies upon *Drummond v. University of Pennsylvania*, 651 A.2d 572 (Pa.Cmwlth. 1994).

In *Drummond*, a group of plaintiffs, which ranged from civic groups to putative students, sought to enforce a contract between the City of Philadelphia and the University of Pennsylvania that provided for 125 full-tuition scholarships to residents of Philadelphia. The plaintiffs believed, *inter alia*, that the contract was intended to award 125 scholarships for each entering class. The City and University believed the contract was intended to cover 125 students total, all classes combined. This Court held that the plaintiffs lacked standing to sue the City, noting that "[w]hen a governmental contract is at issue, the test for whether a member of the public is a third-party beneficiary must be strictly applied." *Drummond*, 651 A.2d at 578 (citing *Clifton v. Suburban Cable TV Company, Inc.*, 434 Pa.Super. 139, 642 A.2d 512 (1994)).[11] Notably, this Court

---

*completely liquidate any deficiency* that may be created by the completion thereof.

R.R. 1014 (emphasis added). Paragraph 3 of the Closeout Agreement reveals the City's obligation to indemnify the Redevelopment Authority for all costs in completing Exhibit "B." As discussed below, Exhibit "B" is an approved and submitted budget, which covers future acquisitions.

11. This Court stated, *in dicta*, that Section 302 of the Restatement (Second) of Contracts does not apply to government contracts. Section 302 does not say that. In *Limbach Co., LLC v. City of Philadelphia*, 905 A.2d 567 (Pa.Cmwlth.2006), this Court applied the principles in Section 302 to a government contract.

also held that the contract expressed an intention not to create any third-party beneficiaries to the contract.

*Drummond* is distinguishable because it stated an intention to exclude third-party beneficiary rights. By contrast, the Closeout Agreement does not express such an intention. Paragraph 4 states the opposite. It provides funding for third-parties, unnamed, with a claim for money damages caused by the Redevelopment Authority. It is the kind of contract clause that expressly creates rights in persons that suffer damages as a result of the actions taken under a contract between other parties. *See Keefer*, 376 Pa. at 369–70, 102 A.2d at 696.

The trial court believed that the City's obligation in Paragraph 4 was to cover only those claims presented by property owners whose properties were scheduled for acquisition under the renewal plan. Setting aside whether Paragraph 4 can be read that way, the Centennial Building was, in fact, scheduled to be acquired under the recorded plan until 1978. Further, as noted by Condemnees, that recorded plan could not be changed without a public hearing; agreement by the development stakeholders; and a public vote by City Council. Changes could not be effected by a contract between the City and Redevelopment Authority. It was an abuse of the trial court's discretion to take testimonial evidence to refute the public record that showed that the Centennial Building was scheduled for acquisition at the time the Closeout Agreement was executed. Alternatively, the trial court capriciously disregarded this public record of the Redevelopment Authority's intention to acquire the Centennial Building.[12] Nevertheless,

---

Section 313 of the Restatement speaks to government contracts. It states that a member of the public is generally an incidental beneficiary of a government contract that undertakes a project to benefit the public, such as the construction of a park. If the park does not go forward, members of the public do not have standing to enforce that contract because they are incidental beneficiaries.

Section 313(2) of the Restatement (Second) of Contracts states as follows:

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a) the terms of the promise provide for such liability; or

(b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is *consistent with the terms of the contract* and with the policy of the law authorizing the contract and prescribing remedies for its breach.

RESTATEMENT (SECOND) OF CONTRACTS § 313(2) (1981) (emphasis added). Section 313(2)(b) embodies the principles of Section 302 of the Restatement. Where the promisee is liable to a member of the public, the promisor may face direct action from the member of the public "consistent with the terms of the contract." RESTATEMENT (SECOND) OF CONTRACTS § 313.

In *Keefer*, 376 Pa. 367, 102 A.2d 695, our Supreme Court held that unnamed citizens and property owners were third-party beneficiaries of a contract between a municipality and a contractor, whereby the contractor assumed liability for any damages caused during the construction. Stated otherwise, unnamed persons may be third-party beneficiaries of a government contract.

12. Other evidence ignored by the trial court was the inclusion of the Centennial Building in the 1973 appraisal that the Redevelopment Authority filed with the Lawrence County Recorder of Deeds. Further, the Authority's attorney, Edward Gamble, issued a title report on the Centennial Building. The Closeout Agreement repeatedly expresses the parties' intention to complete the 1968 renewal plan. *See* Paragraph 2 of the Closeout Agreement; R.R. 1013 ("The [City] hereby consents and agrees to the completion of the activities … approved as a part of [the renewal plan]."). *See also* Fourth, Fifth, Sixth "Whereas"

whether the City and the Redevelopment Authority intended to acquire the Centennial Building when the Closeout Agreement was executed is irrelevant.

First, in a *de facto* condemnation, there is no intention to acquire a property.[13] As we have explained:

A *de facto* taking is not the physical seizure of property; rather, it is an interference with one of the rights of ownership that substantially deprives the owner of the beneficial use of his property.

*Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 480 (Pa.Cmwlth.2006) (quoting *Visco v. Department of Transportation*, 92 Pa.Cmwlth. 102, 498 A.2d 984, 985 (1985)). A *de facto* condemnation is similar to action for trespass or an action for negligent interference with a property interest.[14] Where the injury is a direct result of *intentional action* by an entity clothed with the power of eminent domain, that entity will be held liable in a *de facto* condemnation action. *Central Bucks Joint School Building Authority v. Rawls*, 8 Pa. Cmwlth. 491, 303 A.2d 863, 866–67 (1973). Here, the Redevelopment Authority's actions, such as its notice to the tenants of the Centennial Building of its impending demolition, were intentional, and they deprived Condemnees of the beneficial use of their property.

Second, Paragraph 4 does not express an intention to limit the City's liability to a specifically named or type of claimant. Paragraph 4 obligates the City to fund "unidentified claims" for which the Redevelopment Authority lacks the funds. Stated otherwise, the claim can be presented by any person, not just those who own property scheduled for acquisition.

The 1975 Cooperation Agreement, which is incorporated into the Closeout Agreement, required the Redevelopment Authority to obtain the City's approval before negotiating an acquisition price above $50,000. The City argues that this means it had the right to pre-approve any condemnation, even a *de facto* condemnation. We disagree that the Cooperation Agreement is even relevant.

First, Paragraph 4 did not limit the City's liability to cover "costs" and "obligations" of the Redevelopment Authority to those specifically approved by the City. Second, the Redevelopment Authority did not promise, in any of the operative documents, that it would not cause an injury in

Clauses of Closeout Agreement; Exhibit "B" to the Closeout Agreement (providing a budget of $268,650 for acquisitions not identified in the renewal plan) and contemporaneous filings with HUD, repeatedly stating the intention of the City and the Redevelopment Authority to complete the renewal plan.

13. *De facto* condemnations are referred to as "inverse condemnations" because they are instituted by the condemnee, not the condemnor. *See* William Cressler, *Contributions of the Commonwealth Court to Condemnation Law Since 1970*, 20 Widener L.J. 193, 202–03 (2010) (discussing the terminology used in *de facto* condemnation cases). A condemnation that is intentional is instituted by the condemnor.

14. Indeed, "acts not done in the exercise of ... eminent domain and not the immediate, necessary or unavoidable consequence" of such exercise cannot be the basis of a proceeding in condemnation. *In re Collins*, 20 Pa.Cmwlth. 601, 343 A.2d 67, 69 (1975). Redress in such a situation is limited to a trespass action for negligence. The delineating criteria between a *de facto* condemnation and an action in trespass is whether the landowner suffers specific damage to his property as the result of the negligent actions or tortious conduct of the condemning body *indirectly*, through a third party or some external agent, which results in a trespass. *Fulmer v. White Oak Borough*, 146 Pa.Cmwlth. 473, 606 A.2d 589, 590–91 (1992).

excess of $50,000. The costs covered by Paragraph 4 are those incurred as a result of claims against the Redevelopment Authority, whether known or unknown, intentional or unintentional. If the Redevelopment Authority had negligently caused the wrong building to be demolished, the City would have been required to fund judgment against the Redevelopment Authority by reason of Paragraph 4.[15]

Essentially, the City argues that it cannot be liable for the wrongs of the Redevelopment Authority because it did not pre-approve the Redevelopment Authority's commission of those wrongs. This reasoning extends the meaning of the City's contractual right to pre-approve the Redevelopment Authority's *negotiations* to the breaking point. Further, the City's reasoning cannot be reconciled with the language of Paragraph 4, which specifically covers claims that are "unidentified." If a claim is unidentified, necessarily it cannot be pre-approved by the City.

The minutes of a meeting of the Redevelopment Authority on July 15, 1977, contemporaneous with the signing of the Closeout Agreement, confirm that Paragraph 4 obligated the City to cover shortfalls in the Redevelopment Authority's funds. At that meeting, the Authority's attorney, Gamble, stated, in relevant part, as follows:

> (3) The financial Statement evidences the capacity to pay for the expenses set forth; if the funds are inadequate, the City agrees to liquidate any deficit that may arise. If there is an excess in monies, the City gets the excess. (A probability over a period of time.)
>
> (4) If there are any expenses which are disputed, contingent, unliquidated or un-

identified, the City will also bear these costs.

R.R. 1297–1298. The September 21, 1977, minutes of City Council confirm the City's express acceptance of the responsibility to cover potential shortfalls in the Redevelopment Authority's funds. *See McGaffic,* 973 A.2d at 1054.

Finally, the Closeout Agreement, including Paragraph 4, was a form contract drafted by HUD, no doubt to protect itself; the City and Redevelopment Authority simply filled in the blanks. The parties had to sign the Closeout Agreement in the HUD-prescribed form. Walter Haglund, an expert witness for the City, affirmed that HUD would not permit the City or Redevelopment Authority to stray from the specific language in the Closeout Agreement. And without the Closeout Agreement, HUD would have stopped the flow of federal dollars needed to complete the demolition of downtown New Castle. The testimony of Gamble and Flannery was incompetent to illuminate what the federal government, the scrivener of the Closeout Agreement, meant in Paragraph 4.

The Redevelopment Authority has not demanded the City to cover the shortfall that makes it unable to pay Condemnees. After 35 years of litigation, the judgment has grown to $2 million; the Redevelopment Authority is out of business; and it has no incentive to make any demands of the City. A critical consideration in whether to grant third-party standing is whether the original promisee lacks the ability or the incentive to enforce the promisor's agreement. *See Scarpitti,* 530 Pa. 366, 609 A.2d 147; *Guy,* 501 Pa. 47, 459 A.2d 744. The Redevelopment Authority has no incentive to enforce the City's promise;

---

**15.** Such a claim would likely be brought under a trespass theory instead of a *de facto* condemnation as discussed above in note 14.

Condemnees do have the incentive. This is enough to confer third-party beneficiary status on Condemnees with respect to the City's obligation under Paragraph 4. *Id.*[16]

In sum, Paragraph 4 expresses an intention to make Condemnees third-party beneficiaries of the City's promise to cover shortfalls in the Redevelopment Authority's ability to pay "disputed, contingent, unliquidated or unidentified claims." This language satisfies the "general rule" for recognizing third-party beneficiary status. In any case, the circumstances here also satisfy the principles of Section 302 of the Restatement (Second) of Contracts. The performance of the City's promise satisfies its obligation "to pay money" to the Redevelopment Authority, and the circumstances for doing so are compelling. *Scarpitti*, 530 Pa. at 372–73, 609 A.2d at 150–51. They are compelling because private property has been taken by government, a matter with constitutional implications. Recognition of Condemnees' status as an intended beneficiary of Paragraph 4 "effectuates the intention of the parties." RESTATEMENT (SECOND) OF CONTRACTS § 302 (1979).

### Laches

█ The City offers alternative grounds for affirming the trial court. It contends that even if Condemnees can enforce the City's promise given in Paragraph 4, their action is barred by the doctrine of laches. The City contends that Condemnees waited two decades to bring this action against the City, and this delay has prejudiced the City because it did not secure federal funding to pay Condemnees' *de facto* condemnation award. The City lost its claim

that Condemnees' contract action was barred by the statute of limitations for assumpsit actions. However, the City argues that using third-party beneficiary rights is an equitable remedy that allows the City to assert laches as a defense.

█ A party asserting the doctrine of laches must first show that there was a delay caused by the other party's failure to exercise due diligence, and second, prejudice from that delay. *Bullock v. Bullock*, 432 Pa.Super. 643, 639 A.2d 826, 828 (1994). Laches is based on "some change in the condition or relations of the parties which occurs during the period the complainant unreasonably failed to act." *Id.* at 829 (quoting *Patten v. Vose*, 404 Pa.Super. 426, 590 A.2d 1307, 1309 (1991)).

In the most recent litigation between these parties before this Court, *McGaffic*, 973 A.2d 1047, this Court held that Condemnees did not violate the statute of limitations for filing their breach of contract action because the statute did not begin to run until the City refused to honor its obligation under the Closeout Agreement. *Id.* at 1053. That refusal took place in September of 1997, and Condemnees commenced their suit in 1998, well within the statute of limitations. A one-year pause does not show a failure by Condemnees to exercise due diligence.

From the onset of this drawn-out litigation, the City has known that it could be held financially responsible for a *de facto* condemnation award to Condemnees should one be established. Indeed, the City was so advised by the trial court when it granted the City's request to be dismissed from Condemnees' 1978 *de facto*

---

**16.** *Limbach*, 905 A.2d 567, affirmed the third-party beneficiary status of an unpaid contractor under a system that made the party named in the contract, U.S. Airways, a mere conduit of funds to the contractor. As in *Limbach*, funds provided by the promisor, the

City, under Paragraph 4 do not stop with the promisee, the Redevelopment Authority, but are immediately transferred to the third-party beneficiary, Condemnees. In this respect, Condemnees, and other third-parties, are the true "beneficiaries" of the City's promise.

condemnation petition. *McGaffic v. Redevelopment Authority of the City of New Castle* (Law. Cnty. Ct. of C.P., No. 160–1978 M.D., filed April 25, 1980), slip op. at 14; R.R. 923.

Further, the City and the Redevelopment Authority were aware of the potential for *de facto* condemnation claims arising from the redevelopment project. In July of 1975, Gamble alerted the Redevelopment Authority in a written memo that its actions could expose it to *de facto* condemnation claims. R.R. 2059–60. Indeed, at the time of the execution of the Closeout Agreement, one *de facto* condemnation claim, the Clara Thomas property, had already been asserted against the Redevelopment Authority and was settled shortly after the Closeout Agreement. R.R. 1770.

The City asserts that the delay has caused prejudice because it did not obtain HUD funding to pay the *de facto* condemnation award to Condemnees. First, the City cites no authority for its premise that HUD would have funded *de facto* condemnation judgments. Second, it was the City that chose not to set up a reserve for claims such as that of Condemnees out of the block grant it did receive from the federal government. Instead, it allowed the Redevelopment Authority to litigate and drive up the ultimate judgment. The City has not made out a claim of prejudice.

It is doubtful that laches is even a defense. The underlying claim is for breach of contract, *i.e.*, an action at law, and laches is a defense to a suit in equity. *Freeman v. Lawton*, 353 Pa. 613, 46 A.2d 205 (1946). The City argues that because third-party beneficiary status requires an inquiry into what is "appropriate," it implicates equitable principles. The City conflates the court's exercise of discretion with equity, and the City does not cite to precedent to support its theory that third-party beneficiary contract claims are equitable, not legal, actions.

We reject the City's argument that the trial court's decision can be upheld on the basis of laches.

### Breach of Closeout Agreement

The City offers a second alternative ground to affirm the trial court. It argues that the Redevelopment Authority breached the Cooperation Agreement, and this breach bars the Redevelopment Authority's ability to enforce Paragraph 4 of the Closeout Agreement. It follows that Condemnees, who step into the shoes of the Redevelopment Authority with respect to enforcement of Paragraph 4, are also barred. The City claims that the Redevelopment Authority's failure to obtain the City's approval of the acquisition of the Centennial Building by *de facto* condemnation violated the Cooperation Agreement.[17]

First, the Cooperation Agreement was executed on May 16, 1975, *after* the Redevelopment Authority had effected its April 1973 *de facto* condemnation of the Centennial Building. It is difficult to see how the Redevelopment Authority could have broken a promise two years before it was made.

Second, the City's breach of contract argument relies on the provisions in the Cooperation Agreement that govern the "procedures to be followed by the [Redevelopment Authority] in acquiring [properties]...." R.R. 1753. Those procedures, *inter alia*, obligate the Redevelopment Authority to obtain appraisals; to notify the City within 10 days of valuing a property; and to obtain the City's approval "before

---

17. The City also cites other breaches of the Cooperation Agreement, including submission of a report for any eminent domain proceedings and approval for acquisition of property not previously designated for acquisition.

any negotiation" on properties with an appraisal in excess of $50,000. R.R. 1754. The City does not relate these provisions to the Redevelopment Authority's *de facto* condemnation of the Centennial Building. The City cannot make this relationship because the procedures in the Cooperation Agreement cited by the City cover intentional acquisitions of real property, not a *de facto* condemnation. The Cooperation Agreement says nothing whatsoever about *de facto* condemnation, and it imposes no duties upon the Redevelopment Authority with respect thereto.

We reject the City's contention that the Redevelopment Authority's alleged breach of the Cooperation Agreement bars Condemnees' action. Paragraph 4 covers any "unidentified claims" brought against the Redevelopment Authority. That provision does not limit the City's responsibility to cover shortfalls in any way, let alone for costs incurred where the Redevelopment Authority's actions may have violated some other agreement between the City and the Redevelopment Authority.[18]

## Conclusion

For the above-stated reasons, the order of the trial court is reversed.

## *ORDER*

AND NOW, this 22nd day of July, 2013, the order of the Court of Common Pleas of Lawrence County dated February 6, 2012, in the above-captioned matter is hereby REVERSED.

---

18. A breach of the Cooperation Agreement by the Redevelopment Authority has not been established. The connection of such a breach to *de facto* condemnations is tenuous. Such a condemnation is never "negotiated" because it is not desired by the condemnor.

---

DISSENTING OPINION BY Judge LEADBETTER.

Respectfully, I dissent. In concluding that Appellants have standing as intended third-party beneficiaries of the 1977 Closeout Agreement between the City and the Redevelopment Authority, I believe that the majority misconstrued the language of the contract and created intent, in the absence of intent. In addition, I believe that the majority erred 1) in concluding that the trial court erroneously considered extrinsic evidence in ascertaining intent; and 2) in rejecting the trial court's factual determination that the parties to the Closeout Agreement did not intend to confer any benefit on Appellants or to include their property within the terms of the agreement.

In *Guy v. Liederbach,* 501 Pa. 47, 61, 459 A.2d 744, 751 (1983), our Supreme Court adopted Section 302 of the Restatement (Second) of Contracts (1979), which provides a limited exception to the strict rule that a third party's rights must be expressly provided in the contract. Even though the Court carved out a limited exception to that strict rule, it has been noted that "*Guy* did not alter the requirement that in order for one to achieve third[-]party beneficiary status, that party must show that both parties to the contract so intended, and that such intent was within the parties' contemplation at the time the contract was formed." *Kirschner v. K & L Gates, LLP,* 46 A.3d 737, 762 (Pa.Super.2012) (citation omitted). Therefore, even under the exception, the keystone inquiry is the intent of the contracting parties.[1]

---

1. As in other issues of contract interpretation, we must first look to the provisions of the contract in order to ascertain the parties' intent. If the terms of the contract are clear, "the intention of the parties must be ascertained from the document itself." *Victoria Gardens Condo. Ass'n v. Kennett Twp. of Ches-*

As an initial matter, I disagree with the majority's interpretation of the Closeout Agreement. Contrary to its view, the agreement appears on its face to cover properties intended to be condemned and taken, and not those that became the subject of *de facto* taking claims after the agreement was executed. It certainly does not express an intent to benefit Appellants. Pursuant to the Closeout Agreement, the parties entered into a financial settlement of the Neighborhood Development Program whereby the Redevelopment Authority would "proceed with the necessary undertakings and actions to complete the disposition of said properties and the activities as set forth in Exhibits 'A and B.'" Closeout Agreement, Reproduced Record (R.R.) Volume (Vol.) 3 at 1012. Exhibit A to the agreement consisted of "lands acquired under the said Program" and Exhibit B consisted of "activities approved to be undertaken as a part of the [program but] not yet completed by the [Authority]." *Id.* The Centennial Building was not listed in the exhibits.

In addition, I take exception to the majority's reference to extrinsic evidence to ascertain intent while at the same time eschewing the trial court's use of such evidence for the same purpose. Specifically, the majority cited the minutes from a July 15, 1977 Redevelopment Authority meeting and quoted Mr. Gamble, the Authority's general counsel when the Closeout Agreement was signed. Although the majority concluded that those minutes confirmed its interpretation of the Closeout Agreement, they merely seem to indicate the City's awareness of what it was undertaking in the agreement. Pursuant to those minutes, Gamble, in pertinent part, stated as follows:

(3) The financial Statement evidences the capacity to pay for the expenses set forth; if the funds are inadequate, the City agrees to liquidate any deficit that may arise. If there is an excess in monies, the City gets the excess. (A probability over a period of time.)

(4) If there are any expenses which are disputed, contingent, unliquidated or unidentified, the City will also bear these costs.

Exhibit D–39, R.R. Vol. 4 at 1297–98.

Next, although the majority acknowledged that the Closeout Agreement was a form contract drafted by HUD, it failed to take that factor into consideration in ascertaining the contracting parties' intent. It merely noted that the testimony of Attorney Gamble and former City Councilman Flannery was incompetent to illuminate what HUD meant in paragraph four. The federal government, however, was not a party to the agreement. What must be analyzed is the intent of the *parties* to the contract. *Kirschner,* 46 A.3d at 762. Where, as here, the contract at issue was essentially a contract of adhesion, the totality of circumstances should have determined the parties' intent. *Ario v. Reliance Ins. Co.,* 981 A.2d 950, 963 (Pa. Cmwlth.2009). In other words, "boilerplate contract clauses are not dispositive of a claim to be a third-party beneficiary of a contract or series of contracts." *Id.* at 963. That brings us to the majority's determination that the trial court erred in considering extrinsic evidence which, I suggest, helped to exemplify the totality of circumstances relevant to ascertaining the

---

ter Cnty., 23 A.3d 1098, 1105 n. 12 (Pa. Cmwlth.), *appeal denied,* 611 Pa. 644, 24 A.3d 365 (2011). If not, "it is for the trier of fact to determine what the parties intended by

resolving conflicts in the relevant parol evidence." *Drummond v. Univ. of Pa.,* 651 A.2d 572, 580 (Pa.Cmwlth.1994).

contracting parties' intent when entering into a contract of adhesion.

It is well established that, in the event that the contracting parties' intent is not clear from the face of the agreement, the court must examine extrinsic evidence in order to determine intent. *Drummond v. Univ. of Pa.*, 651 A.2d 572, 580 (Pa. Cmwlth.1994). Such a determination is a question of fact and the trial court's interpretation is controlling, if supported by substantial evidence. *Id.* Although I would conclude that the Closeout Agreement appears on its face to cover properties intended to be condemned and taken and not those that became subject to *de facto* taking claims after the agreement was executed, I would further conclude that the trial court did not err in considering testimonial evidence in ascertaining the contracting parties' intent at the time of formation.

Here, the trial judge credited the testimony of Mr. Gamble and Mr. Flannery, the latter of whom served as a City councilman from 1970–1977. Mr. Gamble testified that the only properties that were contemplated for purchase under the agreement were those included as disposition parcels; the Centennial Building was not included as a disposition parcel. March 10, 2011 Hearing, Notes of Testimony (N.T.) at 10–13; R.R. Vol. 2 at 636–39. Mr. Flannery testified that he would not have voted to approve the agreement had there been any consideration to purchase the Centennial Building. *Id.* at 75–77; R.R. at 701–03. Both Gamble and Flannery testified that neither Appellants nor *de facto* claimants generally were intended to be covered under the terms of the agreement and the court credited this testimony. *Id.* at 11–13, 24, 47, 75–77; R.R. Vol. 2 at 637–39, 650, 673, 701–03; Trial Court Opinion at 14. Accordingly, looking beyond the language of the contract, the circumstances surrounding its execution and the credited testimony support the trial court's factual determination that the parties to the Closeout Agreement did not intend to confer any benefit on Appellants or to include their property within the terms of the agreement.

Moreover, I do not believe that the trial court's determination in this regard is undermined, as the majority suggests, by the Clara Thomas case. In that case, the City agreed to pay damages to Clara Thomas one month after the 1977 Closeout Agreement even though her property similarly was not listed as a disposition parcel in Exhibit A to the agreement. (Her property was also removed from the redevelopment plan in 1978.) In distinguishing the instant case, the court noted that Thomas filed her *de facto* taking claim before the agreement and that the City was aware of that claim when it executed the agreement. Observing that Appellants did not file their petition for appointment of viewers until October 1978, fifteen months after the agreement, the court reasoned that the City and the Authority could not have been aware of Appellants' claim for a *de facto* taking at the time the agreement was finalized. More importantly, the City may have had any number of reasons for settling the Clara Thomas claim and, therefore, that subsequent settlement cannot necessarily be construed as evidence of the parties' intent at the time the agreement was signed.

Finally, I believe that the majority disregarded the governmental status of the contracting parties, which requires a stricter analysis of third-party beneficiary status. *See Clifton v. Suburban Cable TV Co., Inc.*, 434 Pa.Super. 139, 144, 642 A.2d 512, 515 (1994), *cert. denied*, 513 U.S. 1173, 115 S.Ct. 1152, 130 L.Ed.2d 1110 (1995) (holding that courts considering government contracts "must take a more narrow

view of third-party beneficiary status . . . and apply a more stringent test to determine whether a third party qualifies for beneficiary status.")

Accordingly, I would affirm.

President Judge PELLEGRINI and Judge SIMPSON join in this dissenting opinion.